Argued March 9; affirmed June 13, 1950

# RUSHLIGHT AUTOMATIC SPRINKLER CO.,
## *v.* CITY OF PORTLAND ET AL.

219 P. (2d) 732

*Lloyd V. Weiser,* of Portland, argued the cause for respondent. With him on the brief was C. C. Hall, of Portland.

*Virgil H. Langtry,* Deputy City Attorney and *Darrel L. Johnson,* Deputy City Attorney, of Portland, argued the cause for appellants. With them on the brief were Alexander G. Brown, City Attorney, John F. Reynolds and J. Robert Jordan, all of Portland.

On the brief of counsel amici curiae were George Neuner, Attorney General, J. M. Devers, Assistant Attorney General, Chief Counsel, Oregon State Highway Commission, Samuel A. Hall, Assistant Attorney General, and C. W. Enfield, Assistant Attorney General, all of Salem.

Before Lusk, Chief Justice, and Brand, Belt, Rossman, Bailey, Hay and Latourette, Justices.

ROSSMAN, J.

This is an appeal from a decree of the Circuit Court which (1) held that the defendants had no right to the sum of $21,472.21 which the plaintiff deposited with the City of Portland, one of the defendants-appellants, concurrently with the submission of a proposal made by the plaintiff for the construction of a city sewer;

(2) decreed that the plaintiff is entitled to judgment against the City in the amount of $21,472.21; and (3) ordered the other defendants-appellants to pursue the course requisite to the return to the plaintiff of the money just mentioned.

The plaintiff, which is a corporation, is engaged in construction work. The defendants are the City of Portland, its Mayor and Commissioners. The Mayor and the Commissioners have no personal interest in this controversy and, accordingly, in lieu of using the terms ''defendants'' or ''appellants'', we shall speak of the City.

The plaintiff deposited with the City the aforementioned sum of $21,472.21 concurrently with the submission of a-bid made in the course of competitive bidding for the construction of a sewer. It claims that when it compiled its bid it inadvertently omitted the cost of one item, steel, which constituted a part of the contemplated construction work. The plaintiff apprised the City of the purported mistake before the City did anything concerning the bids except to open them, and at about the same time requested permission to withdraw its bid.

The City presents two assignments of error. The first is:

''The Court erred in its findings of fact with reference to the first cause of suit.''

The second is:

''The Court erred in finding that the plaintiff is entitled to be relieved from the consequence of its bid on account of the alleged mistake.''

The nature of the first assignment of error is better

indicated by the following contentions into which the City subdivided it:

> "The mistake was not an honest mistake and was not free from culpable negligence on the part of the plaintiff. The mistake was not discoverable from the bid made.
>
> "The City of Portland was damaged in the sum of approximately $143,000.00 after credit is given to the plaintiff for all of the mistakes that it claims."

The assignments of error can be considered concurrently.

January 14, 1948, the City advertised for proposals for the construction of a project known as the Columbia Boulevard Unit of the City's Sewer and Sewage Disposal Project. The notice required all bids to be in the City's possession not later than 2:00 p. m., February 5, 1948, and stated:

> "All Proposals must be upon the regular blank forms furnished with the Specifications, and must be accompanied by a certified check for an amount equal to or exceeding five percent (5%) of the total bid."

The notice also said:

> "The right is reserved by the City to reject any or all bids, or to accept the proposal which appears most advantageous."

The contractors who submitted proposals were furnished with instructions, specifications and plans. A page of the instructions said:

> "Each bid must be accompanied by a certified check on a bank in good standing, payable to the City Treasurer, for an amount not less than five percent (5%) of the total extended amount of the bid. Such check shall be forfeited to the City as

liquidated damages in case the Bidder fails or refuses to enter into a contract and furnish a satisfactory bond within Ten (10) days (Sunday excepted) after notice to him that his bid has been accepted. * * *

"The City reserves the right to reject any or all bids, or to waive irregularities not affecting substantial rights."

The proposal of the plaintiff, which was entered upon a form prepared by the City, said:

"Accompanying this Proposal is certified check on Canadian Bank of Commerce for the sum of $25,000.00 according to the conditions of the advertisement and instructions to bidders. If this Proposal shall be accepted by the City of Portland and the undersigned shall fail to execute a satisfactory contract and bond, as stated in the Instructions to Bidders hereto attached, within Ten (10) days (Sundays excepted) from the date of notification, then the City may, at its option, determine that the undersigned has abandoned the contract and thereupon this contract shall be null and void, and the cash or certified check accompanying this Proposal shall be forfeited to and become the property of the City of Portland, otherwise the certified check accompanying this Proposal shall be returned to the undersigned."

The check for $25,000.00 was more than five per cent of the plaintiff's bid. The excess was returned to the plaintiff when this controversy occurred, and only $21,472.21, the amount of the challenged judgment, is in issue.

Five proposals were submitteed to the City. The plaintiff's in the amount of $429,444.20, was the lowest. The next higher was submitted by the Guy F. Atkinson Company in the sum of $671,600.00. The other three were $673,832.06, $684,891.50 and $1,217,799.60. The

estimate made by the City's Board of Engineers, but undisclosed to the bidders prior to the submission of bids, was $632,000.00. The City had segregated the entire undertaking into 31 units and required all bidders to divide their proposals into 31 units. The total for the 31 units represented the aggregate bid.

According to the complaint:

"Shortly after said bids were opened, and prior to awarding said contract to any bidder, the plaintiff herein discovered that it had made an honest mistake in its bid and had erroneously omitted from its unit bid from which its total bid was compiled and made up, the steel required for the reinforcement of said concrete sewer, in the amount of $99,225.68."

As we shall presently see, the City concedes that the mistake was made. It terms the mistake a culpable one.

The evidence which the parties submitted is virtually free from contradiction. The issue which it presents is largely one of inference drawing. The findings of fact state:

"The plaintiff inadvertently omitted from its bid, the reinforcing steel required in the plans and specifications in the construction of the sewer, of a total cost of $99,225.68."

"On the day following the opening of the bids, a representative of the plaintiff orally invited the attention of the City Engineer of the City of Portland to the fact that it had made a mistake in its bid."

"While the Board of Engineers  *  *  *  had under consideration the several bids, including that of the plaintiff, and before it made any report or recommendation  *  *  *  respecting the same, and before the City of Portland awarded said con-

tract to plaintiff, the City Engineer  *  *  *  was advised by the plaintiff that the error claimed had to do with the omission of the cost of the steel from its bid.''

''February 9, 1948, the plaintiff wrote the City Council  *  *  *  a letter received by it on February 11, 1948, in which the plaintiff advised the defendants that it was withdrawing its bid due to an error in assembling the bid made by its estimating department in estimating the project, and advising that it would be impossible for the plaintiff to proceed with the project without considerable loss to the plaintiff and requesting a return of the certified check  *  *  *.''

''Up to the time of the receipt of said letter by the defendants and for some ten days thereafter, none of the bids had been accepted by the defendants, and that on February 26, 1948, the plaintiff's bid was accepted by the defendants  *  *  *.''

''February 26, 1948, and prior to the acceptance of the plaintiff's bid by the defendants, the plaintiff addressed and delivered a further communication to the City, again advising the defendants of its mistake in computing its bid, requesting that it be permitted to withdraw said bid and stating that it would be impossible for the plaintiff to complete the contract for the amount of its bid without great financial loss.''

''March 3, 1948, the plaintiff, in writing returned to the City Auditor  *  *  *  the copies of the proposed contract  *  *  *.''

''March 19, 1948, the defendants awarded the contract to the Guy F. Atkinson Company without readvertising for bids and declared a forfeiture of the plaintiff's deposit,  *  *  *.''

''The plaintiff made a substantial mistake in its bid; that said mistake was an honest mistake and was free from culpable negligence on the part of plaintiff; that said mistake was apparent on the face of plaintiff's bid when compared with the bids

of the other bidders and with the estimate of the City of Portland Engineers for the estimated cost of said project; * * *."

"The City of Portland, Oregon, was not injured by the plaintiff's mistake, its position not being changed thereby, and suffered no damage."

We have said that the City concedes that the plaintiff made the alleged mistake; for instance, the City's brief states:

"While it appears clear from the evidence introduced that the plaintiff actually overlooked including reinforcing steel in every unit of the bid which required reinforcing steel, it is not clear that such mistake was made except through more than ordinary negligence. Furthermore, the evidence indicates that this error may well have resulted from willful negligence on the part of the plaintiff. In the statement of the case, it was noted that in both Paragraphs 3 and 6 of the instructions to bidders, the plaintiff was warned against unbalancing its bid. The evidence clearly indicates that the plaintiff unbalanced its bid and then forgot to balance it on another item, * * *. It was the contention of the City in the lower court that although the comparatively low amount of the plaintiff's bid would be some indication that an error had been made, yet such error cannot be found by an investigation of the face of the bid, * * *. The City also contended that the mistake in figuring steel, which the evidence indicates was made, although substantial, did not, by approximately $143,000.00 account for the difference between the plaintiff's bid and the next higher bid * * *."

The City claims that in submitting its bid the plaintiff resorted to the unbalancing method. A contractor who unbalances a bid employs a low cost for one unit of construction and a correspondingly higher one for

another unit. One of the provisions of the instructions said: "Contractors are warned against unbalancing their bids." Nevertheless, the City Engineer testified: "A smart bidder will do it"; that is, unbalance his bid. Evidently many contractors employ the method. The work in question was divided by the City into 31 units. The first two were:

"6770 lin. ft. 102″ by 102″ semi-elliptical concrete arch sewer, complete, at $——— per lin. ft. $———."

"30 lin. ft. 102″ semi-elliptical concrete arch sewer constructed to El. 37.0 only, at $——— per lin. ft. $———."

We assume that under the unbalancing method one who thought that the job would involve substantially less than 6770 lineal feet on Item 1 and much more than 30 lineal feet on Item 2 would submit a low rate per lineal foot on Item 1 and a high rate per lineal foot on Item 2. The City does not claim that the unbalancing method is unlawful. Apparently the plaintiff's estimators employed that method, but their failure to include in the bid the cost of the reinforcing steel was not the result of the use of the method; the failure to include the cost of the steel in the bid was an oversight.

The plaintiff's proposal was compiled by its chief estimator who was also its superintendent of construction. He was assisted by at least three other employees of the plaintiff, and the final tabulations were reviewed by one Lee Irving, president of the plaintiff. The plaintiff did not receive a bid upon the cost of steel from a dealer in steel until the day before the bid was submitted. Due to the fact that the City required all proposals to be segregated into 31 units, which made up the entire project, and to the further fact that the specifi-

cations required steel in twelve of the units, it was necessary for the estimator to apportion the entire cost of the steel into twelve units. The apportionment was never made, and the proposal did not include a single penny for steel. Possibly the late hour at which the steel bid was received by the plaintiff may have played its part in causing the mistake. Plaintiff's estimator explained that compiling the cost of a large under-taking places the estimator "under quite a strain * * *. We worked late the night before and got up early the next morning." Mr. Irving, referring to the sub-bid on the cost of the steel, testified: "That is the only sub-bid we had on the job. It just didn't get in in the rush, I guess, at the last minute to get this bid together."

When the reading of the bids disclosed the large discrepancy between the plaintiff's and the others, plaintiff's officers surmised that an error may have been committed and at once returned to their work sheets. The day following they discovered that nothing had been included in the proposal for the cost of steel. On that day Mr. Irving called upon the City Engineer and told him of the mistake.

Mr. John W. Cunningham, a member of the Board of Engineers, to which the City entrusted this project, termed the discrepancy between the plaintiff's and the City's estimate as "a very decided difference," and added, "Yes, it impressed me as a very low bid." From the testimony of Mr. Ben Morrow, City Engineer, we take the following:

"Q. Is there anything in the tabulation of bids that you find there which could lead you affirma-tively to believe that a mistake had been made in the Rushlight bid?

"A. That is rather a tough question to ask, but as a matter of fact, just looking at it, you wouldn't necessarily say that until you looked at the total quantities—total bid as compared with the others. I don't think anybody looking the thing over would say, Here is where the mistake is, there is a mistake in it, if that is what you mean.

"Q. Is there a patent error that shows in those bids?

"A. No, not as such.

"THE COURT: I suppose, Ben, you figure the City got a pretty good deal when that bid was as low as it was?

"THE WITNESS: In this particular estimate I would certainly say that."

Mr. Morrow testified that while the bids were being read, the smallness of the plaintiff's "scared us to death * * * and we thought, By George, there is a Santa Claus or something or other." The City's brief says: "The grossly disproportionate amount of variation between bids strongly indicates the possibility of error."

The failure to include the cost of the steel accounts for only $99,225.68 of the difference between the plaintiff's and the Atkinson bid. There remains $143,000.00 for which no explanation has been given, unless it is found in the unchallenged suggestion made by the City that when the plaintiff unbalanced one item of its bid it failed to balance it upon another. The City suspects Items 1 and 16. The suggestion appears to have merit.

We observe that $99,225.68, the amount of the omitted steel item, is slightly more than 23 per cent of $429,444.20, the amount of the plaintiff's bid.

The foregoing will suffice as a review of the evidence. We employed in our review parts of the find-

ings of fact because those findings, apart from the conclusions stated therein, are not in dispute.

As we said, the City concedes the mistake concerning the steel item which the plaintiff's officers, to their manifest embarrassment, described. The plaintiff prays that its mistake be deemed excusable; the City insists that the error was a culpable one and links it to the contention that the plaintiff disregarded the instructions and unbalanced its bid. As we have already said, the unbalancing of the bid played no part in the making of the mistake about the steel.

So far as we can ascertain, the plaintiff's bid was compiled by an adequate staff of estimators. No one challenged the competence of the estimators nor questioned the methods they pursued. The record shows that one of the estimators, after having calculated the amount of earth that would have to be moved in one phase of the construction work, called upon a member of the City Board of Engineers for the purpose of comparing his estimate with that made by the board. He found that the two were virtually the same. That fact and an occasional other one mentioned in the record tend to show that the estimators were careful.

One who considers in the cloistered calm of appellate court chambers the mistake which the plaintiff made is prone to indict. Tranquil repose magnifies mistakes made by those who work under stress and strain. It is even inclined to condemn alacrity and insist upon such methodical care that error will be virtually eliminated. Courts, however, cannot create a Utopia and must deal with the realities of life. Contractors who compute estimates do not work under ideal conditions. The record shows that those who computed the plaintiff's bid were compelled to cope with conditions which afforded

error opportunity to steal in. The trial judge who saw the witnesses, and who himself questioned some of them, recited in his findings that the mistake was excusable and not culpable. We know of no reason for rejecting that finding; we think that the evidence warrants it.

We believe that it is manifest from the evidence that the difference between the plaintiff's bid and the next higher was so large that all of those concerned with the undertaking were rendered uneasy. The plaintiff's officers at once returned to their work sheets, fearing that they must have committed a mistake. The City Engineer, according to his own words, found the variation so great that it ''scared us to death.'' A member of the Board of Engineers, who seemingly expressed himself in wary words, described the plaintiff's bid as ''a very low'' one and termed the difference between it and the City's estimate ''a very decided difference.'' The bid aroused suspicion in all minds. We think that the difference apprised the City that a mistake had probably occurred.

It is true, as already indicated, that the steel item accounts for only $99,225.68 or 41 per cent of the total disparity of $242,155.80 between the plaintiff's and the next higher bid. Therefore, it alone did not provoke the misgivings. The $99,225.68 was a substantial part of the total difference. The variation between the second and third high bids was only $2,232.06. The difference between the second and the fourth high bids was $13,291.50. The material fact is that the omission of the steel was a substantial factor in reducing the bid to such a low amount that the city officials surmised that it was too good to be true.

The parties, aided by amici curiae, have argued at length the legal principles which they deem applicable to the controversy. Their briefs contain numerous citations to the authorities.

In support of the proposition that "the majority rule is that a bidder cannot withdraw his bid after the bids are opened," the City cites the decisions of which we will now take notice.

The first citation is *Northeastern Construction Co. v. City of Winston-Salem*, 83 Fed. 2d 57. The City of Winston-Salem, after advertising for proposals for the construction of a sewer, received four, the lowest being that submitted by the defendant, Northeastern Construction Company. That bid was accompanied by a bond executed by the other defendant, United States Guaranty Company, wherein the guarantor promised to pay the city $12,000 if the construction company was awarded the work and failed to sign the contract. After the bids had been opened, the city notified the Northeastern Company that it had accepted its proposal, but added that it had eliminated from the contemplated work 20,000 feet of sewer lines which were part of the project included in the advertisement for bids. The 20,000 feet were 15 per cent of the advertised project and thus the city awarded to the defendant only 85 per cent of the work covered by the submitted bids. The advertisement for proposals stated: "The entire work is to be let in one contract." The construction company refused to sign the contract for 85 per cent of the work and thereupon the city instituted action upon the bond. The decision said:

"The sole question necessary to be considered upon this appeal is whether the alteration made by the Board of Aldermen of the plaintiff after the bids

had been opened, in the amount of work to be contracted, was such a material alteration in the terms of the proposal, as justified the construction company in refusing to carry out the contract."

The court held the alteration material and concluded that the plaintiff was not entitled to prevail. Obviously, the City does not depend upon the holding in that case as a precedent for this one, but it quotes dictum from that decision which it deems material. We think it is better to resort to statements of principle made by courts which decided cases involving issues similar to the one before us.

The City's brief describes *Baltimore v. J. L. Robinson Construction Co.,* 123 Md. 660, 91 A. 682, L. R. A. 1915A 225, as "a case much similar to the instant case." The facts of that case were that the City of Baltimore advertised for bids to construct a schoolhouse and received one from the plaintiff, which proved to be the lowest. A statute which regulated proposals for contracts with the City of Baltimore said:

"To all such bids there shall be attached a certified check of the bidder upon some clearing house bank, and the bidder who has had the contract awarded to him, and who fails to promptly and properly execute the required contract and bond, shall forfeit said check. The said check shall be taken and considered as liquidated damages and not a penalty for failure of said bidder to execute said contract and bond. * * * The amount of said check shall be five hundred dollars, unless otherwise provided by ordinance, * * *."

The court, referring to the statute, said:

"It will be noticed that, in plain terms, the section directs that the bidder shall deposit a certified check to indemnify the city in case he, as the successful bidder, fails to execute the contract and furnish

a bond; that bids when filed are irrevocable; and that the contract shall be awarded to the lowest responsible bidder. It certainly must be that there was the intention that these explicit directions should have some force and meaning. We must ascribe a reasonable construction to them or we render the statute a mere nullity.''

After the bids had been opened the plaintiff discovered that, in making its tabulation of the cost of the various items, it had entered for the heating and ventilating system $952.13, whereas the correct sum was $11,952.13. Its request to be permitted to withdraw the bid was denied and the contract was awarded to it. It refused to sign the contract and thereupon the City declared the deposit forfeited and re-advertised for bids. Still later the bidder filed the declaration to recover the deposit of $500 which precipitated the action under review. In holding that the money could not be recovered, the decision said:

"This may seem a hardship upon a bidder who has actually made a mistake, but if the statute is to have any effect that must be the result. The statute is an essential part of the proposal and the bidder makes all its terms and conditions an obligation upon himself by submitting a bid.''

We quote further from the decision:

"The case of Moffett v. Rochester, 178 U. S. 373, relied upon by the appellee, was upon a bill in equity for a reformation of the proposal and therefore is not authority for the form of action in this case. In fact, all of the cases, cited by the appellee, are cases in equity and in the most of them there was no statute involved.''

Therefore, it is clear that the form of the proceeding and the terms of the statute were material in the court's mind.

*West Chicago Park Commissioners v. Carmody,* 139 Ill. App. 635, is cited by the City. It appears from that opinion that the park commissioners advertised for bids for some work which they wished performed. The advertisement required each bid to be accompanied with a deposit of $500. The plaintiff made a bid and also the necessary deposit. His proved to be the lowest bid. The commissioners notified him of that fact and repeatedly requested him to sign the needed contract and file an undertaking. The plaintiff never signed the contract nor did he file the bond. Shortly he claimed that on account of the recent death of his wife he had been rendered nervous and had been advised by a physician to discontinue his business. The park commissioners awarded the contract to another bidder and forfeited the plaintiff's deposit of $500. Later, the plaintiff instituted an action of assumpsit to recover the deposited money. Evidently the court, in holding that he was not entitled to recover, had no faith in his excuse of sickness, for it declared:

"The excuses which he gives for so failing and neglecting are of the most flimsy character. * * * Our impression from the evidence is, that plaintiff, for some reason best known to himself, desired to relieve himself of the responsibility cast on him by the acceptance of his bid, and perhaps this was worth $500.00 to him."

The plaintiff in that case made no claim of a mistake.

Both the City and amici curiae cite *Robinson v. Board of Education,* 98 Ill. App. 100. That decision was based upon an action filed by the plaintiff [appellant] for the recovery of a deposit of $560, which he made concurrently with the filing of a bid for work incidental to the construction of a schoolhouse. The plaintiff's bid was $18,600. He claimed that he made an error of

$10,000 in footing the items which entered into the total. A condition of all the bids was:

> "If any proposal shall be withdrawn before the conclusion of the second regular meeting of the board following the receipt of the proposal, the deposit accompanying it shall be subject to forfeiture and retention by the board as liquidated damages."

The bids were opened and the contract was awarded to the plaintiff who rejected the tendered contract. As a witness, he claimed that he discovered his mistake before the opening of the bids and mentioned it at that time to the defendant's architect. The decision, however, says that the defendant, "as the preponderance of the evidence clearly shows, first knew that the appellant claimed a mistake in his bid some time after the contract had been awarded to him." The decision held:

> "Conceding that appellant notified the board of his mistake, and that he requested to withdraw his bid at the time when he claimed to have done so, it was at a time before the conclusion of the second reglar meeting of the board following the receipt of the proposal and the deposit of appellant by appellee. This made appellant's deposit subject to forfeiture as liquidated damages by the appellee under the terms of his bid."

*Crilly v. Board of Education of Chicago,* 54 Ill. App. 371, receives much attention in the City's brief. In that case the plaintiff submitted a written bid upon the masonry work of a proposed schoolhouse and accompanied it with a check for $630. The deposit was made under a rule of the defendant which required deposits and provided that any bidder awarded a contract who refused to proceed should forfeit his deposit. The plaintiff was awarded the contract, but refused to accept it under a claim that he made an error of $3,000

in writing his bid. The trial court referred the issues to a master who reported that the evidence was insufficient to warrant a finding that an error was made. From the decree in favor of the defendant, the plaintiff appealed. In affirming the decree, the appellate court said:

> "We are not prepared to say that the master was not correct in both conclusions. The proof to establish a mistake in a material part of a contract ought to be free from suspicion, clear and convincing."

It held that the plaintiff's evidence did not meet those standards.

A decision which appears to be more nearly akin in its facts to the instant case than the three Illinois Appellate Court decisions just reviewed is *Bromagin v. City of Bloomington*, 234 Ill. 114, 84 N. E. 700. It is not cited in the briefs. The City of Bloomington had published notice that sealed proposals would be received for laying a water main. The plaintiffs, Bromagin and Shade, formed a partnership on the last day for submitting bids and in haste made their estimates. In preparing the bid, they inadvertently used the weight per foot of iron pipe for the price per foot and in that way bid approximately $6,000 less than they had intended. Their bid was $25,567.02, and accompanying it was a certified check for $2,800. The trial court entered a decree for the plaintiffs, which permitted rescission of the bid and restrained the City from forfeiting the $2,800. Upon appeal, the decision said:

> "Upon a hearing the Master found in substance that appellees were not guilty of negligence before the awarding of said bid * * *; that within five hours after the awarding of said contract to appellees they discovered the said mistake and notified the city attorney of said city, * * *."

Continuing, the decision said:

"When the bids were opened the inadequate price quoted on 16-inch pipe by appellees was noticed by the city engineer and the attention of the other members of the Board of Local Improvements called to it. * * *

"The bid submitted showed, by one item thereof, that appellees proposed to furnish and lay 6020 feet of sixteen-inch pipe for a sum therein designated. This sum was less than they could purchase this pipe for, leaving out of consideration the expense of laying the same. The city engineer, who was a member of the board of local improvemnts, observed this fact and acquainted the other members of the board therewith. It seems apparent, therefore, that the board of local improvements accepted the bid knowing that this mistake had been made. It is suggested that the board could not know but that appellees may have fixed this item at less than its actual cost and fixed other items at a correspondingly high price, so that upon the whole they would be able to realize a profit from doing the work at the total of the bid."

That statement, of course, had reference to a purported use of an unbalanced bid. Going on, the decision said:

"This argument is without merit, for the reason that the city reserved the right to accept bids as to any part of the work and to reject them as to other parts thereof, so that, save for the mistake, the city might have accepted this bid as to this sixteen-inch pipe and rejected it as to all other items therein contained. Bromagin discovered the error in his bid and notified the city attorney of the same and asked to be relieved from any further obligation on the day and within five hours after the bid was accepted and before any contract had been actually signed. It does not appear but that the city, after Bromagin called on the city attorney, could have accepted some one of the other bids

made. Under these circumstances the court properly decreed the relief sought by the bill. Moffett v. Rochester, 178 U. S. 373; School Commrs. v. Bender, 72 N. E. Rep. 154.

"The appellants place great reliance upon Steinmeyer v. Schroeppel, 226 Ill. 9. This case is distinguished from that in two respects: First, here there seems to have been some reasonable excuse for the error made in calculating the bid; there was no such excuse in the Steinmeyer case. Second, here the party to whom the bid was made knew of the mistake at the time the bid was accepted; it was not so in the case in the 226th."

The City depends upon *Steinmeyer v. Schroeppel*, 226 Ill. 9, 80 N. E. 564, mentioned in the quotation, and we will shortly review that decision. It will be noticed that in the words quoted the court which wrote that decision differentiated it from a set of circumstances substantially similar to those before us.

Both the City and amici curiae cite and quote from *Kimball v. Hewitt, Mayor*, 2 N. Y. Sup. 697, affirmed at General Term 3 N. Y. Sup. 756, 15 Daly 124. The decisions in that case were based upon a suit by a taxpayer to enjoin the officials of the City of New York from awarding a contract for electric lights to some bidders to whom the officials proposed to award the contract. The City, after advertising for bids, received several, including one from a concern entitled New York Electric Construction Company. After the bids had been received, but before any of them had been opened, the aforementioned Electric Company was permitted to withdraw its bid. When the officials manifested an intention to award the contract to one of the remaining bidders, the suit under consideration was filed. Nothing stated in either of the opinions indicates

that the Electric Company claimed that it had made a mistake in computing its bid. The decision at Special Term (2 N. Y. Sup. 697) intimated that the taxpayer in whose name the suit was filed was not the real party-plaintiff and that "somebody who had a private purpose to accomplish" sponsored the suit. It took note of the fact that an official of the Electric Company filed affidavits in support of the suit and described that concern as "a mere paper company," possessing neither plant, wires nor franchise. Referring to the Electric Company, the decision, at General Term, said:

"* * * There is strong reason to suspect that that company, and not the plaintiff, is the real party in interest here."

It is evident that that decision was not concerned with a mistake made by a bidder nor with any issue present in the case before us; in fact, the injunction, sought by the suit, was denied.

Both the City and amici curiae depend upon *Brown v. Levy* (Tex. Civ. App.), 69 S. W. 255, which affirmed a judgment for the defendant entered in the trial court after it had held that plaintiff's petition entitled him to no relief. The defendant was a property owner desirous of building a hotel. The plaintiff was a contractor who submitted a bid of $64,000 and accompanied it with a deposit of $500. After his bid had been accepted he claimed that he discovered that in adding some figures he made a mistake of $10,000 and that, accordingly, his bid should have been $74,000 and not $64,000. The owner, however, insisted that the bid had been accepted, and refused to relieve the contractor from his purported error. The court said:

"* * * This shows a consummated agreement, constituting a binding contract, unless the mistake made by the plaintiff in procuring data

for his bid should be held sufficient to release him from the contract. That it should not be given that effect is, we think, quite clear. The petition fails to show that the defendant was in any wise responsible for the mistake referred to."

When we later consider *Leonard v. Howard,* 67 Or. 203, 135 P. 549, we will again mention the decision just reviewed.

Those are the authorities upon which the City relies to support its contention: "The majority rule is that a bidder cannot withdraw his bid after the bids are opened."

Next, the City submits this proposition:

"In cases of this nature the rule of equity that forfeitures are not looked upon with favor does not apply. The forfeiture of such a deposit is not a penalty but rather an agreement between the parties as to what the liquidated damages will be in the event that the bidder refuses to enter into a contract."

It cites the decisions which we will now review.

*City of Portsmouth v. Portsmouth & Norfolk Corp.,* 122 Va. 258, 95 S. E. 278, was begun as an action in assumpsit to recover a deposit of $5,000 which the plaintiff made concurrently with the filing of a bid. The bid was accepted and the city awarded the contract to the plaintiff, but it declined to execute the tendered contract. Its refusal of the contract was not due to any mistake, but, as stated in the opinion, "admittedly by reason of its inability to finance the undertaking and for no other cause." Almost five years after it had refused the contract, the plaintiff instituted the action under review to recover the deposited money. The ordinance which specified the terms of all bids said:

"Each bidder is required to accompany his bid with a certified check payable to the city treasurer in the sum of $5,000.00 to be forfeited to the city as liquidated damages should he fail to comply with his bid and execute the contract  *  *  *."

The plaintiff contended that the insertion of that provision in contracts was ultra vires the powers of the city. The court ruled otherwise and held that the city was entitled to the deposited money.

Next, the City cites *McCormick v. City of Union-town* (Pa. Com. Pl.), 4 Fay L. J. 151, 55 York 55. The plaintiff in that suit submitted a bid upon some public work and, pursuant to requirements, accompanied his bid with a check for $3,500. The check was given with the understanding that it would be forfeited as liquidated damages if the plaintiff was awarded the job and failed to execute a contract in conformity with the form incorporated in the call for bids. The plaintiff's bid was accepted, but he refused to sign the tendered contract because he discovered, so he claimed, an ambiguity in the instrument and wished it removed. In holding that reason insufficient, the court declared:

"From section B-20 of the instructions to bidders attached to the statement it would seem that any such request for interpretation should have come before the bid was made."

It will be recalled that the prospective contract was incorporated in the call for bids.

*Baltimore v. Robinson Construction Co.*, supra, which is the third authority upon which the City relies, is reviewed in a previous paragraph of this opinion.

The City next cites *Morgan Park v. Gahan*, 136 Ill. 515; 26 N. E. 1085, which was based upon an action

filed by a contracting firm for the recovery of $1,100 which they deposited with a bid. The village had advertised for bids and the plaintiffs' proved to be the low one. It was accepted and the plaintiffs were requested to sign the contract. They declined to do so on the ground that when they bid there was no legal assessment existing out of which to pay for the work and that they did not discover that fact until after they bid. The call for bids did not state that the contract price would be paid from funds raised by any particular assessment, and so the court, in denying relief to the plaintiffs, said:

"* * * It cannot therefore be said that a particular assessment entered into the contract created by said offer, bid and acceptance. * * * It will scarcely be contended, that if appellees had entered into the contract and gone on with the improvement, and the assessment had proven so irregular as that it could not have been corrected, appellees would thereby have been deprived of receiving compensation for their work * * *. If, when they had completed the contract upon their part, the assessment proved illegal, and therefore unavailing as a fund to pay them the contract price for their work and material, the village board would have been bound to make another assessment * * *. These various sections expressly provide an adequate remedy for anyone who shall have contracted with a city or village to be paid out of a special assessment, * * *."

That was an instance in which the purported mistake concerned an immaterial fact.

*Robinson v. Board of Education,* supra, the next authority upon which the City relies, is reviewed in a preceding paragraph of this opinion.

The last citation made by the City in support of

the proposition under consideration is *Wheaton Building Co. v. Boston,* 204 Mass. 218, 90 N. E. 598. The plaintiff in that case, in response to an advertisement, submitted a bid for the construction of a schoolhouse, which was accepted. Later, after he had declined the contract, the deposit which accompanied his bid was forfeited. He had not withdrawn his bid before its acceptance. After his deposit had been forfeited he instituted an action for its recovery, based partly upon a contention that a portion of the specifications which concerned steel work were ambiguous and that he had interpreted them differently from the City. He made no claim that the City knew of his construction when it accepted his bid. The lower court held against the plaintiff and the decision under review, in affirming the resulting judgment, said:

> " * * * The specifications were not capable of reasonable misconstruction. * * * It is only when the phrase of the contract has no obvious meaning, or is reasonably capable of diverse interpretation and was in fact differently understood by the parties, that there is no agreement. * * * The erroneous interpretation of the language of the specifications was not induced by anything said or done by any agent of the defendant."

Later, when we consider *Leonard v. Howard,* supra, we shall again mention the decision just reviewed.

Next, the City submits this proposition:

> "The rule of equity contended for by plaintiff will relieve against a unilateral mistake only where unconscionable advantage would be taken of the mistaken party, where the mistake was made without bidder's negligence, and then only when the parties can be placed in status quo, without injury to the other party."

We shall now review the decisions submitted in support of that statement.

*John J. Bowes Co. v. City of Milton,* 255 Mass. 228, 151 N. E. 116, was a suit in equity brought to compel the return to the plaintiff, a bidder, of a check for $2,500 which it had deposited to assure the city that the plaintiff would sign a contract if its bid was accepted. The plaintiff's bid, which was the lowest, was $201,784.00. The defendant's committee found that the available funds were insufficient to warrant the defendant in going ahead and thereupon the defendant's architect made some revisions in the plans for the purpose of reducing costs of construction. After the plaintiff had reviewed the revised plans it agreed to reduce its bid $15,164.00, and thereupon the defendant's committee voted unanimously to award the contract to him. At that juncture the president and the treasurer of the plaintiff were called before the committee and were told of the action taken. According to the finding of the master, which was approved in the decision under review, the president of the plaintiff was pleased at the action taken by the committee and was satisfied with the terms of the contract which was placed before him. Later, when the plaintiff received information that its bid was much lower than the nearest competitor, it claimed it had made mistakes totaling $7,174.00 and that it would have to increase its bid $16,800.00. In holding that the suit could not be maintained, the court said:

> "The principal ground upon which the plaintiff contends that it is not bound by the proposal and acceptance is that the amount finally bid of $184,020 was due to a miscalculation of the sum for which it would construct the building. It is well settled that where a contract has been entered into under

a mutual mistake concerning a material fact a court of equity will grant relief. It is equally well settled in this commonwealth that a mistake of but one of the parties to a contract is not a ground for relief either in law or equity. [citations] There was no mistake on the part of the members of the committee who acted for the town; they acted in good faith without any knowledge that the plaintiff had made any mistake in the submission of its bid."

That, therefore, was an instance in which the revised bid was accepted in good faith without any information of an infirmity in the bid.

Next, the City cites *Crilly v. Board of Education,* supra, which is reviewed in a previous paragraph of this opinion.

*Daddario v. Town of Milford,* 296 Mass. 92, 5 N. E. 2d 223, is much cited by the City and, concerning it, its brief says: "The Daddario case seems to be almost in point with the instant case." It was a suit in equity to compel the return of a certified check for $5,000 which the plaintiff had deposited with the defendant to accompany a bid for the construction of a sewage treatment plant. The construction work was to be done under an agreement with the Federal emergency administration of public works, whereby the Government agreed to contribute 45 per cent of the cost of the work. A vote of the town that authorized the project rendered the latter subject to the rules of the Federal public works administration, which provided that the contract should be awarded to the lowest bidder, and rendered the award subject to the approval of the State director of public works. The published notice which invited bids stated that the work was a public works administration project and that no

award could be made by the sewer commissioners without the authorization of the State director of public works. It also declared that for a period of 30 days after the opening of bids no bid could be withdrawn. Each bidder was required to accompany his bid with a certified check for $5,000, to be forfeited as liquidated damages if, after acceptance of his proposal, he refused to sign the contract. The plaintiff's bid was the lowest. Two days after the opening of bids the plaintiff requested permission to withdraw his bid, claiming that he had made errors in computing its amount. He wrote: "My price on 1-2-4 concrete was to be $26.50 a yd. instead of $16.50 a yd. and on the 1-2½-5 was to be $20.00 instead of $10.00 a yd." The sewer commissioners granted his request and awarded the contract to the second low bidder. At that juncture the Federal emergency administration of public works refused to approve what had been done and insisted upon a forfeiture of plaintiff's deposit. Then the sewer commissioners yielded to the authority of the public works administration and, rescinding their action, awarded the contract to the plaintiff in accordance with his proposal. The plaintiff refused the contract and filed suit for the recovery of his deposited check. In holding that the suit could not be maintained, the court said:

"The proposal signed by the plaintiff by necessary implication incorporated all the terms and conditions contained in the sewer commissioners' invitation to bid. * * *

"In the case at bar an essential term of the proposal was that 'No bidder may withdraw his bid for a period of thirty days after the day set for the opening thereof.' * * * It is plain the essential terms of the proposal were (1) that the

plaintiff, as bidder, would not withdraw his bid for a period of thirty days after the date set for opening the bids, October 29, 1935; (2) that the contract would be awarded to the lowest responsible bidder as soon as practicable after the opening of the bids, but not until the State director of the public works administration should have approved the award; and (3) that the certified check for $5,000 deposited by the plaintiff with his bid should be forfeited to the town as liquidated damages in case the plaintiff failed to execute the contract within ten days after notice of the award of the contract to him.  *  *  *

· "The plaintiff has no ground of complaint in that the sewer commissioners tried to allow him to withdraw his proposal.  Both he and the commissioners knew that their action in this regard was subject to the approval of the State director.  *  *  *  His mistake was not a mutual mistake of the plaintiff and defendant as to any essential matter connected with the contract, and it does not clearly appear that it was one of material fact, as distinguished from an unwise, hasty or careless statement of the prices intended to be bid."

Obviously, the court was required to hold that the controversy was governed by the rules promulgated by the Federal agency.  It will be seen that the decision says that the plaintiff's mistake did not appear "one of material fact."  The plaintiff claimed that he had used $16.50 instead of $26.50 in figuring 1-2-4 concrete and $10.00 instead of $20.00 in figuring 1-2½-5 concrete, but the decision does not mention quantities, nor the total amounts which were involved.  If the total yardage was small, the mistake could not have been material.

*Carpender v. City of New Brunswick*, 135 N. J. Eq. 160, 36 A. 2d 40, next cited by the City, deals with

issues so foreign to those before us that we refrain from commenting upon it.

Apparently *Leonard v. Howard*, 67 Or. 203, 135 P. 549, is the principal authority upon which the City depends. Its brief, referring to that opinion, terms the latter "very much in point." The brief amici curiae cites that decision eight times and, referring to it, says that it involved "facts similar to those here presented." The plaintiff in that case, a general contractor who did business under the name of Leonard Construction Co., not Inc., held the contract for the construction of a hotel building in Portland. The defendants, A. L. Howard and P. Barger, were a partnership engaged in the plumbing business. The following events occurred: In October, 1911, the plaintiff gave the defendants a set of blueprints and specifications for the contemplated hotel building so that the defendants could enter a bid upon the plumbing work. The defendant, A. L. Howard, made an estimate, and October 27 the partnership handed the plaintiff a signed bid in the sum of $4,975.00. November 15 the plaintiff notified the defendants that their bid was accepted and on that day the parties signed a contract governing the plumbing work. At the same time they signed a set of blueprints which covered the plumbing work. The next day the plaintiff delivered to Barger a set of blueprints so that the firm could proceed with the plumbing work. November 17 the defendants delivered to the plaintiff a surety bond guaranteeing their faithful performance of the plumbing contract. Later, Barger notified the plaintiff that there was a discrepancy between the count of the plumbing fixtures made by Howard when he computed the bid and the number shown in the blueprints which

he [Barger] had signed. The defendants notified the plaintiff that they would not perform the contract. At that juncture the plaintiff made formal demand upon the defendants and their surety for the performance of the contract. After the defendants refused the demand, the plaintiff re-let the plumbing work at a price of $1,852 higher than the amount of the defendants' bid and brought the action under review for damages; that is, for the sum of $1,852. The answer of the defendants (1) denied all averments of the complaint except the part which alleged that the defendants were partners, and (2) alleged that (a) the blueprints which were delivered to the defendants after the contract had been signed were not the ones upon which they had bid, and (b) in all of the transactions culminating in the contract the Leonard Construction Company represented itself as a firm of several persons and that the defendants would not have submitted their bid had they known that the Leonard Construction Company was composed of one person only. The answer, as disclosed by the abstract of record filed in the case, closed with this prayer: "Wherefore these defendants pray judgment against the plaintiff for their costs and disbursements incurred herein." It will be seen that no equitable relief was sought. We have read the answer carefully, as set forth in the abstract of record filed in that case, and observe that it nowhere uses the term "mistake". It contains no averments of the kind found in pleadings which seek rescission, reformation or equitable relief. The essence of the answer was that the contract delineated in the complaint was not the one which the defendants signed. A jury trial resulted in a verdict and judgment for the plaintiff. The defendants ap-

pealed. An examination of the briefs filed in that case indicates that the defendants did not claim that any mistake had occurred, and that they sought nothing resembling rescission or reformation. They recognized that the cause was a legal action as distinguished from a suit in equity.

The opening paragraph of the opinion of this court began as follows: "We conclude from the evidence that the plans submitted to Howard were identical with those signed by Barger." In other words, no mistake had been made concerning the plans. The paragraph continued:

> " * * * The discrepancy probably arose from the failure of Howard to properly check up his work when he examined them. For this carelessness or mistake plaintiff cannot be held accountable, the mistake not being mutual, and no fraud on the part of plaintiff being charged or proved: * * * There is no such discrepancy between the bid submitted and the next higher bid as would justify us in saying, as a matter of law, that plaintiff was thereby put upon notice that Howard had made a mistake."

The decision also said:

> "We cannot assent to the proposition that by reason of the mistake made by Howard there was no 'meeting of minds' upon a contract. * * * They bid upon the contract, but by inattention overlooked some of the details, and bid too low. The case is not different from what it would have been had they correctly counted the articles to be furnished, and by some mistake or oversight miscalculated the cost of them, and thereby been misled into making an unprofitable bid. * * *; but in our opinion the evidence shows that the low bid made by them was the result of a mistake, and this

mistake the result of Howard's careless examination of the plans. Under such circumstances neither law nor equity will help them: * * *."

It is seen from that opinion that the defendant partnership alone made the mistake and that neither the amount involved in the mistake nor any circumstance attendant upon the bid gave the plaintiff, when he accepted the bid, an inkling that a mistake had occurred. More than half a month had passed from the day when the bid was submitted until it was accepted; clearly, it was not snatched up. Those being the facts, the defendants, in order to prevail, were forced to contend that on account of their unilateral mistake no meeting of the minds had occurred; and, in order to succeed with that contention, had to submit as a proposition of law that if one party to a transaction misconceives a fact and, while laboring under the mistake, makes an offer, no meeting of the minds takes place if the other party accepts the offer wholly unaware of the fact that the offeror had misconceived something.

We pause in our consideration of *Leonard v. Howard* to observe that some legal scholars do not favor the "objective" theory in determining whether or not an exchange of an offer and an acceptance has effected a meeting of minds. Some prefer the "actual intent" theory. Williston, whose views have determined the content of the "objective" theory (Williston on Contracts, Rev. Ed., §§ 1573 and 2294) and Restatement of the Law, Contracts, (see, for example, §§ 70, 71, 503 and 505) which embraces Williston's ideas, have been criticized by the proponents of the "actual intent" theory. The views of the critics are well stated by the brilliant pen of Judge Jerome N. Frank in his specially

concurring opinion in *Ricketts v. Pennsylvania R. Co.*, 153 Fed. 2d 757. Judge Frank's opinion cites numerous pertinent treatises.

The holding in the Leonard decision amounts to nothing more than a refusal to embrace the "actual intent" theory and a continued fidelity to the "objective" rule. When the bid was accepted in that case, the plaintiff had no intimation of any irregularity and no reason to suspect one. The mistake was purely unilateral. That decision says nothing concerning the power of equity to grant relief to one whose offer was accepted by another with notice of a mistake. The observations just made are equally applicable to *Winklebleck v. City of Portland*, 147 Or. 226, 31 P. 2d 637, which is cited in the city's brief. They are likewise applicable to *Brown v. Levy*, supra, *McCormick v. City of Uniontown*, supra, *Wheaton Building Co. v. Boston*, supra, and *John J. Bowes Co. v. City of Milton*, supra.

Next, the City submits this proposition:

"The weight of authority is against allowing a recovery of such a deposit by a bidder who refuses to enter into a contract except under special circumstances not present in this case. Allowing such a recovery would destroy much of the value that experience has shown is attendant upon requiring sealed bidding upon public contracts."

We shall now review the five decisions it submits in support of the proposition.

*Baltimore v. J. L. Robinson Construction Co.*, supra, has been reviewed in a preceding paragraph. *Hattiesburg v. Cobb Brothers Construction Co.*, 174 Miss. 20, 163 So. 676, and *Hattiesburg v. Cobb Brothers Con-*

*struction Co.,* 183 Miss. 482, 184 So. 630, are, in fact, the same case. The second was merely the first on the pilgrimage of the cause through the courts. The plaintiff, a construction company, had submitted the low bid on some work for which the city had advertised for bids and had been awarded the contract. When the plaintiff declined to accept the contract the city forfeited the deposit of $2,500 which accompanied the bid, and then came this action for restitution. Before the plaintiff's bid was accepted the plaintiff notified the city in writing that it had made a mistake in computing its bid, but did not specify the mistake. On the first appeal, the court said:

> "A guaranty deposit can be recovered back by the bidder because of an honest mistake in calculation in making the bid, provided he gives notice of his withdrawal of the bid before any action is taken thereon."

The court held that since the action was not instituted within three years after the cause arose it was necessary that the purported mistake had to be specified in a writing in order to comply with the local statute of limitations. Upon the second appeal, the court said:

> "The letting of public contracts by competitive bidding is for the protection of the public, and the public authorities are without the right to permit a bid for the contract to be withdrawn in the absence of circumstance that would render it inequitable not to permit its withdrawal. The inequitable circumstance here claimed is an honest mistake in determining the amount of the bid. Unless the mistake was in fact made, and honestly made, no right of withdrawal would appear. In determining whether to permit the withdrawal of this bid, the Mayor and Commissioners were under the duty to

the public to ascertain whether a mistake affecting the amount of the bid had in fact been made. In order to do this, it was necessary for them to be advised of the character of the claimed mistake, so that they might consider it in connection with the bid and the advertisement therefor. The mere claim that a bidder has 'made a mistake' or 'found some error' in his bid neither gives him the right to withdraw his bid nor imposes on the public authorities any duty to examine the bid in order to ascertain whether a mistake appears therein. Another reason for requiring the character of the mistake to be set forth in a notice of withdrawal of a bid is that, in an action to rescind the contract made by the acceptance of the bid and to recover a benefit conferred by the bidder on the other party to the contract, the bidder may be confined to the particular mistake claimed to have been made when the notice of withdrawal was given.''

Under that principle, the plaintiff in this case is entitled to prevail. This case is unaffected by any statute of limitations.

The next authority cited by the City is *Tunny v. City of Hastings*, 121 Minn. 212, 141 N. W. 168, which sustained the right of a bidder to recover a deposit of $500 which accompanied a bid made by him to construct some public works. Responding to an advertisement for bids, the plaintiff submitted one for $37,694, which was accepted. After the entry of his bid, but before a contract was signed, the plaintiff discovered that some of the excavation which was involved in the work was through solid rock, and not earth excavation as he had erroneously assumed. When he communicated his belated discovery to the city officials, some conferences occurred with the eventual result that a contract was submitted to him in the amount of $48,600. He declined to sign it and there-

upon the city forfeited his deposit. In holding that the city could not forfeit the plaintiff's deposit on account of his refusal to sign the contract calling for $48,600, the court said:

> "It was competent for the parties to abandon the contract made by the bid and the acceptance of it by mutual consent. That is what they did do. It was made to appear to the officers of the city that the plaintiff had made a mistake in his bid. After that fact appeared, the city at no time evinced any disposition to hold plaintiff to his bid."

The court indicated that if, instead of releasing the plaintiff from his bid, the city had held him to it, it would have been entitled to retain the deposit.

*Tony Amodea Co. v. Town of Woodward,* 192 Ia. 535, 185 N. W. 94, is frequently commended to us in the City's brief. The plaintiff in that case submitted to the town the lowest bid for a street improvement contract. His bid was accompanied with a deposit of $1,000. After the job was awarded to him he refused the contract and, after his deposit was forfeited, he instituted the action under review for judgment for the sum of $1,000. When the bids were opened it developed that the plaintiff's was so much lower than the others that there occurred, according to the decision, "some discussion between plaintiff and the council as to whether he would be able to go on if his bid was accepted." The decision added: "This was before the council accepted his bid." The decision also said:

> "Plaintiff made no effort to correct his bid, or to withdraw it, or to withdraw the check. He gave the council to understand that he would go on with it, and thereafter his bid was accepted. Had plaintiff withdrawn his bid the council would, no doubt, have accepted the next lowest bid; at least, they could have done so."

Thus, it appears that before the plaintiff's bid was accepted he knew that he had underbid all others by a substantial margin, but, notwithstanding that fact, did not claim that he had made a mistake, nor did he ask permission to withdraw his bid. To the contrary, he indicated a purpose to go ahead. At that point the council accepted his bid. Clearly, the situation was controlled by what we said concerning *Leonard v. Howard,* supra.

The foregoing constitutes a review of the principal authorities upon which the City depends. Many additional ones are cited by amici curiae. Now for a summary of results. *Northeasteren Construction Co. v. City of Winston-Salem* was not concerned with any issue presented by this appeal. *Baltimore v. J. L. Robinson Construction Company* was controlled by a statute which has no counterpart in this State's laws. As we said in a previous paragraph, we think that, instead of following *West Chicago Commissioners v. Carmody, Robinson v. Board of Education* or *Crilly v. Board of Education,* all being decisions of the Illinois Appellate Court, we ought to accept as a preceptor *Bromagin v. City of Bloomington,* written by that State's Supreme Court, which involved a set of facts substantially similar to those before us. Moreover, it is more recent than the other three. We know of nothing in *Kimball v. Hewitt, Mayor,* pertinent to the case before us. We have expressed our impressions concerning *Brown v. Levy, McCormick v. City of Uniontown, Wheaton Building Co. v. Boston, John J. Bowes Co. v. City of Milton, Leonard v. Howard* and *Tony Amodea Co. v. Town of Woodward. City of Portsmouth v. Portsmouth & Norfolk Corporation* was not concerned with any mistake, and, since the bidder

could give no reason for the recovery of its deposit, the court very properly held that under the terms of his bid the deposit belonged to the city as liquidated damages. In *Morgan Park v. Garhan* no mistake was made except concerning an immaterial fact. *Daddario v. Town of Milford* was governed by the rules of a Federal agency. The instant case is free from such fetters. Under the holding in *Hattiesburg v. Cobb Brothers Construction Company,* the challenged decree which is before us would have to be affirmed, if we approve of the principle stated in that case. We know of nothing held in *Tunny v. City of Hastings* which could authorize a reversal of the attacked decree.

The plaintiff depends much upon *Moffett, Hodgkins & Co. v. City of Rochester,* 178 U. S. 373, 44 L. Ed. 1108, 20 S. Ct. 957, which was a suit by a bidder for a reformation or rescission of a proposal it made to the city, and for an injunction to restrain the city from forfeiting a bond posted by the bidder pursuant to requirements of the call for bids. The denomination of the bond was $90,000 and, under the call for bids, it would be forfeited to the city if the bidder failed to accept the contract in the event it was awarded to him. When the bids were opened and the plaintiff's engineer, who had prepared the plaintiff's bid, heard it read he at once declared that he discerned errors, and mentioned them. The city's charter provided:

> "Neither the principal nor sureties on any bid or bond shall have the right to withdraw or cancel the same until the board shall have let the contract for which such bid is made, and the same shall be duly executed."

Before any award of contract was made, but at the

time when the city contemplated making the award to the plaintiff, the latter again mentioned the errors in the bid and requested that it be permitted to withdraw its proposal. The mistakes made by the plaintiff's engineer in computing the bid accounted for only a part of the difference between the plaintiff's bid and the next lowest. Had the plaintiff's errors been corrected, its bid would still have been $200,000 below the next lowest. Substantially the same situation exists in the instant case. As in the present case, the city plead, according to the decision:

> "The prices were deliberately and consciously inserted for the purpose of making an 'unbalanced bid', in which low prices in some items are compensated by high prices in others."

The decision held that the errors mentioned in the complaint were not the result of an unbalanced bid.

From the opinion, we now quote:

> "There was no doubt of the mistake, and there was a prompt declaration of it as soon as it was discovered and before the city had done anything to alter its condition. Indeed, according to the testimony of one witness, the clerk of the board, before the mistake was declared by complainant's engineer, expressed the thought that 50 cents per cubic yard for earth excavation was too low."

The court held:

> "The rule between individuals is that until a proposal be accepted it may be withdrawn, and if this principle cannot be applied in the pending case, on account of the charter of the city, there is certainly nothing in the charter which forbids or excuses the existence of the necessary elements of a contract."

The court quoted with approval the following from the decision of the Circuit Court:

"The complainant is not endeavoring 'to withdraw or cancel' a bid or bond. The bill proceeds upon the theory that the bid upon which the defendants acted was not the complainant's bid; that the complainant was no more responsible for it than if it had been the result of agraphia or the mistake of a copyist or printer. In other words, that the proposal read at the meeting of the board was one which the complainant never intended to make, and that the minds of the parties never met upon a contract based thereon. * * * "

The court adopted that view and held that the plaintiff was entitled to prevail. That decision has been cited scores of times, in each instance with concurrence.

*Gavahan v. Village of Shorewood,* 200 Wis. 429, 228 N. W. 497, was an action by a bidder to recover $2,000 which he deposited with the village to assure it that he would enter into a contract if his bid was accepted. The plaintiff claimed that he made a mistake in preparing his bid by omitting the cost of some manholes, that he discovered his mistake before the bids were opened and asked leave to withdraw it. The village refused his request, awarded him the contract and, when he rejected it, forfeited his deposit. After the plaintiff's evidence had disclosed the foregoing, the defendant's motion for a nonsuit was sustained under a belief that the plaintiff had committed a procedural error. In reversing the nonsuit, the court, on appeal, said:

"We are of opinion that when a bidder who has made a mistake in his computations or mistakenly omitted items from consideration in making his estimates in good faith asks to withdraw his bid for correction before the bids are opened, he is

entitled to withdraw it; and that if in such case the municipality refuses to allow him to withdraw it, he is entitled to recover his deposit. It may be that such a rule will allow dishonest bidders to claim mistake when there is none in fact. And it will require re-advertisement where there is only one bid, if the bidder does not file a corrected bid. But the city is in no worse position than it would be had no bid been filed at all, and here there were other bids so re-advertisement would not have been necessary. This is in accord with Moffett, Hodgkins & Clarke Co. v. Rochester, 178 U. S. 373, 20 Sup. Ct. 957.''

From *Frederick v. Union Electric Light & Power Co.*, 336 Mo. 1038, 82 S. W. 2d 79, we quote:

'' * * * To establish the contract sought to be enforced, plaintiff relies upon a letter from defendant and his acceptance of the offer therein, by telegram. Defendant's defense was that, by mistake, the description of the land in the letter was incomplete, and that part of the land intended to be covered by the offer was not described therein. Defendant also filed a cross bill seeking a decree of cancellation, * * *. The court found that there was an offer and acceptance by the letter and telegram which constituted a valid and binding contract and decreed specific performance thereof, * * *. Defendant has appealed from this decree.''

The decision held:

''Plaintiff does not claim to have changed his position in any way before he was notified of defendant's mistake or to have suffered any loss because it made such an offer. We fail to see how he can have any standing in a court of equity to enforce a contract which it is clear that defendant did not intend to make. * * * It is well settled that 'a court of equity is never compelled to render an inequitable decree, however plain and valid may be the contract sued on;' * * *

"We also think that defendant is entitled to a decree of cancellation as prayed for by its cross bill. Reformation, and ordinarily rescission or cancellation, is only granted where there is a mutual mistake. However, there are exceptions made to these general rules in cases where the mistake of one party is either known to the other party or is so obvious, under the circumstances, that it must have been known to him, and the mistake concerns a matter so vital that it can be said that the parties, because of miscalculation or false information, never actually agreed to the same proposition. The rule applicable to this kind of a case is stated in 6 Ruling Case Law, 623, section 42, as follows:

" 'If one of the parties, through mistake, names a consideration that is out of all proportion to the value of the subject of negotiation, and the other party, realizing that a mistake must have been committed, takes advantage of it, and refuses to let the mistake be corrected when it is discovered, he cannot, under these conditions, claim an enforceable contract. * * *' "

*City of Omaha v. Venner,* 243 Fed. 107, was an appeal by the city from a decree which (1) rescinded and cancelled a contract arising out of the plaintiff's bid and the defendant's acceptance thereof, and (2) rendered judgment for the plaintiff for $5,000 earnest money, which accompanied the bid. The city in that case published a circular which sought bids for an issue of municipal bonds totaling $600,000. The circular contained these statements:

"Bonded debt including
these issues ............................$ 6,120,000.00

Valuation for assessment
purposes, 1912, estimated .......... 164,167,720.00

Tax rate for all purposes
1912 per one thousand dollars ..... 12.96"

If the figure of $164,167,720.00 corresponded with the one appearing upon the assessment rolls, the proposed bonds would have been eligible investments for savings banks in New York, Massachusetts, New Hampshire, Vermont and Rhode Island, where the plaintiff, a dealer in municipal bonds, had customers. The plaintiff, construing the circular to mean assessed valuation and not real valuation, submitted a bid which proved to be the most favorable the city received, and it was accepted. Thereafter the plaintiff discovered that the circular's figures referred to actual value, and not assessed value. Assessments were made on the basis of one-fifth of actual valuation. That being true, the bonds were not suitable to the plaintiff's purposes and were less valuable than he had assumed. When the plaintiff declined to accept the bonds at the price stated in his bid, the city sold the issue to another buyer at a price more than $5,000 less than the plaintiff's bid, and appropriated the plaintiff's deposit as liquidated damages. The court, in referring to the "exhaustive arguments" made by the parties concerning the meaning of the term "valuation for assessment purposes", said:

"  *  *  * If it is a question upon which legal minds may differ, it certainly was a question concerning which appellee had a right to be honestly mistaken, and if in making his bid he honestly believed that the language referred to the assessed value of appellant's property for taxation, and not its actual value, then he would be entitled to refuse performance of the contract  *  *  *.

"  *  *  * We base our decision upon the proposition that if the language used with reference to valuation in the circular of March 28, 1912, shall be construed to mean the assessed value of the

property within the city of Omaha, then it was false, * * *. If the language used shall be construed to refer to the actual value of the property within the city of Omaha for taxation, then on this record appellee was honestly mistaken as to the meaning of the language when he made his bid, * * *."

In other words, the city used ambiguous language, and an offeror who uses such language invites mistakes and presents a threshold for later suits for rescission or reformation. The decree was affirmed.

In view of a contention advanced in the brief of amici curiae, but not in the City's brief, we quote the following from the decision just reviewed:

"It is urged in the brief of counsel for appellant that appellee had a complete and adequate remedy at law to recover the proceeds of the check accompanying his bid, and therefore a court of equity has no jurisdiction of the present action. As to this point it is sufficient to say that where the subject-matter of a suit is within the jurisdiction of a court of equity and the objection that the complainant had an adequate remedy at law is not made until a hearing in the appellate court, the reviewing court will not consider the objection."

See also *St. Nicholas Church v. Kropp,* 135 Minn. 115, 160 N. W. 500. The statement just quoted represents our views.

*St. Nicholas Church v. Kropp,* supra, has been much cited in cases of this kind. The plaintiff, wishing to erect a church, advertised for bids and received three, of which the one submitted by the defendant was the lowest. His bid was accompanied with a check for $1,000 to insure the entering of a contract if his bid was accepted. The plaintiff accepted the defendant's

bid and so notified him. That day the defendant discovered that through oversight he had omitted from his calculations the structural steel required in the building, which amounted to $2,350. When that discovery was made the formal contract had not been drafted. The plaintiff at once notified the defendant of his error and stated that he could not proceed unless he received $2,000 more than his bid. At that juncture the defendant awarded the contract to another bidder at a sum of $1,802 more than the defendant's bid and instituted an action upon the defendant's check for $1,000. In holding that the plaintiff was not entitled to judgment, the court said:

"The jury and court found that in his bid Kropp had made an honest mistake without negligence. The mistake amounted to more than $2,000. Does this entitle him to any relief when plaintiff was not to blame in any way for the mistake, and had no knowledge that Kropp had made it? We think the facts herein bring the case within this principle governing a unilateral mistake stated in section 138 i, Story's Equity Jurisprudence:

" 'But where the mistake is of so fundamental a character that the minds of the parties have never, in fact, met, or where an unconscionable advantage has been gained, by mere mistake or misapprehension, and there was no gross negligence on the part of the plaintiff, either in falling into the error or in not sooner making redress, and no intervening rights have accrued, and the parties may still be placed in statu quo, equity will interfere, in its discretion to prevent intolerable injustice.'

\* \* \*

"The question here is whether a mistake of over $2,000 in the bid upon the construction of this church is merely incidental or fundamental. We think the amount is so large that it is unreasonable to suppose that Kropp would have made the bid he did make, if

he had known that the structural iron work was not included therein. Here the finding is that it was an honest mistake made without negligence. Plaintiff was apprised of the error at once. No intervening rights accrued. The belated bid which plaintiff accepted was a trifle less than the one Kropp intended to make. There can be no question of not placing plaintiff in statu quo. It did nothing in reliance upon Kropp's bid, and did not change its position in the least between the time it notified him of the acceptance and the time it received notice of his mistake. * * * This case upon its facts is not distinguishable from Moffett, Hodgkins & Co. v. Rochester, 178 U. S. 373, 20 Sup. Ct. 957, 44 L. Ed. 1108, except that there notice of the error was given when the bids were opened; but that can be of no consequence, since under the statute there applicable the bid could not be withdrawn after being submitted. The court rescinded the accepted proposal to construct certain municipal improvements."

From Williston on Contracts, Rev. Ed., § 1573, the following is taken:

"In two classes of cases mistake of one party only to a contract undoubtedly justifies affirmative relief as distinguished from a mere denial to enforce the contract specifically against him:

"(1) Where the mistake was known to the other party to the transaction.
"(2) * * *

"The first of these rules is based on obvious justice; the second * * *."

From § 1578 of the same authority, we now quote:

"As to other cases than those referred to in a preceding section, the expressions are numerous that mistake, in order to justify relief, must be mutual or the error of one party must be known to the other. That this is true of reformation is nowhere doubted; but some cases afford countenance

for the doctrine that unilateral mistake, while the contract is still executory and the parties can be put *in statu quo,* may afford ground for rescission, and doubtless the discretionary remedy of specific performance may be denied. Rescission has been most frequently sought where a price was bid which because of erroneous arithmetical processes or by the omission of items was based on a mistake. Relief has been allowed in several cases of this and other kinds, though denied in others. In some of them, at least, it would seem that the party not in error should have suspected the existence of a mistake, in which case clearly rescission and restitution should be allowed. Where relief is allowed it is generally said to be essential that the party seeking it shall not have been guilty of negligence.''

In the footnotes to the two sections from which we just quoted will be found citations to the pertinent decisions. Many of the decisions cited by the parties to this case and by amici curiae are noted in the footnotes just mentioned.

Section 503, Restatement of the Law, Contracts, says:

''A mistake of only one party that forms the basis on which he enters into a transaction does not of itself render the transaction voidable; * * *''

Illustration 1, which accompanies the above statement is as follows:

''A, in answer to an advertisement of B for bids for the construction of a building according to stated specifications, sends B a bid of $50,000. B accepts the bid. A, in the calculations that he makes prior to submitting his bid, fails to take into account an item of construction that will cost $5000. If B knows or, because of the amount of the bid or otherwise, has reason to know that A is acting under a mistake, the contract is voidable by A; otherwise not.''

Section 12, Restatement of the Law, Restitution, says:

"A person who confers a benefit upon another, manifesting that he does so as an offer of a bargain which the other accepts or as the acceptance of an offer which the other has made, is not entitled to restitution because of a mistake which the other does not share and the existence of which the other does not know or suspect."

The Reporters' Notes to that section cites many illustrative decisions and some treatises. From the notes, we take the following:

"Where one party knows or has reason to know that the other party has made a basic mistake (see Comment *c*) restitution is granted. This situation has frequently arisen where there has been an error in the price given. In this case rescission is ordinarily allowed. See Moffett, Hodgkins & Clarke Co. v. Rochester, 178 U. S. 373, 44 L. ed. 1108, 20 S. Ct. 957 (1900); Skelton & Co. v. Ellis, 70 Ga. 297 (1882); Bromagin v. Bloomington 234 Ill. 114, 84 N. E. 700 (1908); Hudson Structural Steel Co. v. Smith & Rumery Co., 110 Me. 123, 85 Atl. 384 (1912); Tyra v. Cheney, 129 Minn. 428, 152 N. W. 835 (1915); Martens & Co. v. Syracuse, 183 App. Div. 622, 171 N. Y. S. 87 (1918)."

The above completes our review of the authorities upon this feature of the case. All authorities cited by the parties and not mentioned herein have been carefully examined.

In determining the rule applicable to the facts before us, we must bear in mind that *Leonard v. Howard,* supra, has committed us to the "objective" theory in construing offers and acceptances. Further, this is not an instance in which the offeror did not voice his claim of error until after the offer had been accepted.

The plaintiff promptly notified the City of its mistake; in fact, the city officials suspected a mistake the moment their eyes fell upon the amount of the plaintiff's bid. Then, after the plaintiff, through conferences with the city officials and written communications, confirmed what the officials had inferred, the plaintiff sought leave to withdraw its bid. All of this occurred before the City made any effort to accept any bid.

■ We believe that in this State an offer and an acceptance are deemed to effect a meeting of the minds, even though the offeror made a material mistake in compiling his offer, provided the acceptor was not aware of the mistake and had no reason to suspect it. But if the offeree knew of the mistake, and if it was basic, or if the circumstances were such that he, as a reasonable man, should have inferred that a basic mistake was made, a meeting of the minds does not occur. The circumstances which should arouse the suspicions of a fair-minded offeree are many, as stated in § 94 of Williston on Contracts, Rev. Ed.:

> "* * * And the same principle is applicable in any case where the offeree should know that the terms of the offer are unintended or misunderstood by the offeror. The offeree will not be permitted to snap up an offer that is too good to be true; no contract based on such an offer can then be enforced by the acceptor."

Amici curiae cite *Steinmeyer v. Schoeppel*, supra, in support of a contention that the plaintiff's mistake was not material. As nearly as we can ascertain, no contention of that kind was made in the trial court. It will be recalled that we quoted from *Bromagin v. City of Bloomington*, supra, a more recent decision of the court which wrote the Steinmeyer decision, a para-

graph which differentiated the Steinmeyer case from a situation substantially the same as the one before us.

■ When the City officials opened the plaintiff's bid they surmised that it was too good to be true. When they went through the form of accepting it, they knew that the paper in their hands did not represent the plaintiff's intent. They had no occasion to doubt the truth, which was apparent, that the paper, although it bore the plaintiff's signature, was not in fact the plaintiff's offer. When they adopted their resolution, no meeting of minds occurred. At that time the City had not changed its status quo and had suffered no damage whatever. To be denied the privilege of taking advantage of another's mistake is not to suffer damage. The proposal of the Atkinson Company, second low, was still available, and in fact was shortly accepted.

It is unnecessary to state once more that the proof in cases of this kind must possess a high degree of cogency. The bidder must prove, not only that he made a material mistake, but also that the offeree was aware of it. In this case, the facts which we have mentioned are unchallenged.

It is our belief that although the plaintiff alone made the mistake, the City was aware of it. When it accepted the plaintiff's bid, with knowledge of the mistake, it sought to take an unconscionable advantage of an inadvertent error. Equity is always prepared to grant relief from such situations.

The decree of the Circuit Court is affirmed.