ALASKA INTERNATIONAL
CONSTRUCTION, INC.,
Appellant,

v.

EARTH MOVERS OF FAIRBANKS,
INC., Appellee.

STATE of Alaska, DEPARTMENT OF
TRANSPORTATION AND PUBLIC
FACILITIES, Appellant,

v.

EARTH MOVERS OF FAIRBANKS,
INC., Appellee.

Nos. S–440, S–457.

Supreme Court of Alaska.

March 14, 1985.

Kenneth D. Jensen, Scott H. Finley, Jensen, Harris & Roth, Anchorage, for appellant Alaska Intern. Const., Inc.

E. John Athens, Jr., Asst. Atty. Gen., Fairbanks, Norman C. Gorsuch, Atty. Gen., Juneau, for appellant State of Alaska, Dept. of Transp. and Public Facilities.

Joseph Paskvan, Rice, Hoppner, Brown & Brunner, Fairbanks, Sam E. Baker, Jr., Oles, Morrison, Rinker, Stanislaw & Ashbaugh, Seattle, Wash., for appellee Earth Movers of Fairbanks, Inc.

Hugh G. Wade, Richard H. Foley, Jr., Wade & DeYoung, Anchorage, for amicus curiae Associated General Contractors of America.

Before BURKE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MATTHEWS, Justice.

This is an appeal from a decision of the superior court regarding the acceptance of bids for a road construction project. The court held that the Alaska Department of Transportation and Public Facilities (hereafter "the agency" or DOT/PF) had improperly awarded the project to Alaska International Construction, Inc. (hereafter AIC) rather than Earth Movers of Fairbanks, Inc. (hereafter Earth Movers).

## I.

The facts in this appeal are not in dispute. On March 20, 1984, the agency opened bids on a grading and drainage road project near Nome. Earth Movers submitted the apparent low bid of $3,396,-998.80. AIC, the apparent second low bidder, submitted a total bid of $3,476,680.63. However, a discrepancy was noted in AIC's bid; the numerical price quoted for the "mobilization item" was $90,491.00, while the price for this item as written out was "Nine Thousand Four Hundred Ninety-One Dollars."

At this point, the contracting officer followed the agency's procedure as provided in § 102–1.06 of the Alaska Department of Transportation and Public Facilities Standard Specifications for Highway Construction.[1] That section provides in relevant part that, "[i]n case of a descrepancy [sic.] between the prices written in words and those written in figures, the prices written in words shall govern." Relying on this regulation, the contracting officer recomputed AIC's bid by reducing the figure for mobilization from $90,491.00 to $9,491.00. AIC was not asked for clarification. As a result, AIC's total bid became $3,395,-680.63, $1,300 less than Earth Movers's bid.[2]

After the agency had notified all bidders that it intended to award the contract to AIC, Earth Movers protested the agency's decision based on the agency's Standard Specifications for Highway Construction § 102–1.07(2) which states that irregular bid proposals shall be rejected if the irregularity may tend to make the proposal incomplete, indefinite, or ambiguous as to its meaning.[3] The agency denied Earth Movers's protest and reiterated its intent to award the contract to AIC based on § 102–1.06.[4]

Earth Movers then sought judicial review of the contract award by seeking a temporary restraining order and preliminary injunction. The superior court issued a preliminary injunction on April 2, 1984, which enjoined the agency from awarding the contract to anyone other than Earth Movers. The court subsequently made the preliminary injunction permanent, finding that AIC's mistake was "a material variance that gave the bidder a substantial advantage over other bidders, thereby restricting or stifling competition...." We agreed to review AIC's appeal to this court on an expedited basis, and have consolidated the agency's appeal with it. On May 23, 1984, we entered an order reversing the judgment of the superior court and remanding the case with directions to dismiss the complaint. This opinion explains the reasons for our decision.

Two issues are presented. The first is whether the agency should have rejected AIC's bid because of its mistake. This involves consideration of whether AIC was entitled to withdraw its bid because of the mistake. If AIC could have withdrawn, then it could have chosen whether or not to perform, an option which would have given it a competitive advantage over the other bidders. If this was the case, then the DOT/PF should have rejected AIC's bid. *See King v. Alaska State Housing Auth.*, 512 P.2d 887 (Alaska 1973); *Chris Berg, Inc. v. State Dept. of Transp.*, 680 P.2d 93, 94 (Alaska 1984). The second issue is whether the agency erred by applying its policy favoring words over numerals when it could have determined that the numeral expressed was the intended amount.

## II. STANDARD OF REVIEW

In reviewing an agency's acceptance or rejection of bids for public projects, this court has applied an abuse of discretion standard of review. *See Chris Berg, Inc. v. State Dept. of Transp.*, 680 P.2d 93, 94 (Alaska 1984); *State v. Bowers Office Products, Inc.*, 621 P.2d 11, 13 (Alaska 1980); *Kelly v. Zamarello*, 486 P.2d 906, 917–18 (Alaska 1971).[5] In this case, the

1. This policy was also expressed in the bid instructions.

2. AIC in fact intended the higher amount, $90,-491.00, rather than $9,491.00.

3. This specification provides:
   102–1.07 *Irregular Proposals.* Proposals will be considered irregular and shall be rejected for the following reasons:
   ....
   2. If there are unauthorized additions, conditional or alternative bids, or irregularities of any kind which may tend to make the proposal incomplete, indefinite, or ambiguous as to its meaning.

4. The agency apparently concluded that § 102–1.07(2) did not apply because 102–1.06 operated to cure any irregularity.

5. This standard is appropriate where a question of law implicates the agency's expertise as to complex matters or involves the formulation of fundamental policy. *Rose v. Commercial Fisheries Entry Comm'n*, 647 P.2d 154, 161 (Alaska

superior court did not specify the standard of review which it applied, but it is clear from the record that it gave the agency's findings little, if any, deference. Thus, the superior court apparently substituted its judgment for that of the DOT/PF.

Earth Movers contends that the trial court correctly substituted its judgment because the DOT/PF exercised no discretion, but merely mechanically applied Specification § 102–1.06 to AIC's bid. Further, Earth Movers points out that the agency's letter of April 18, 1984, which explained why AIC's mistake did not give it the right to withdraw, was written sixteen days after the court had enjoined awarding the contract to AIC.

■ The agency's determination clearly required an understanding of the type of business involved. DOT/PF employed this expertise when it determined that AIC's mistake did not give it the right to withdraw its bid. The fact that the determination was not actually written until after the award of the contract may raise questions as to whether the determination is merely a post hoc rationalization. But this possibility at most means that the court should subject the findings to more critical scrutiny. The superior court was not free to disregard the agency's finding, but was required to state why it was an unreasonable one.

## III. DID THE AGENCY ABUSE ITS DISCRETION BY DETERMINING THAT AIC'S BID COULD NOT BE WITHDRAWN BECAUSE OF ITS MISTAKE?

The crucial issue in this case is whether the DOT/PF had a reasonable basis for concluding that AIC could not withdraw its bid. As noted above, if AIC could have withdrawn, it would have been in a more advantageous situation than other bidders, and the DOT/PF then would have been obliged to reject AIC's bid.

■ The prevailing view, and the one which we adopt, is that a contract bidder may withdraw its bid because of a clerical mistake if (1) the mistake is of such consequence as to render enforcement unconscionable; (2) the mistake is material; (3) the mistake occurred despite ordinary care by the bidder; and (4) it is possible to place the other party in the *status quo*. In addition, the bidder must act promptly in order to be entitled to obtain rescission. *See, e.g., City of Devils Lake v. St. Paul Fire & Marine Insurance Co.*, 497 F.Supp. 595, 597 (D.N.D.1980); *M.J. McGough Co. v. Jane Lamb Memorial Hospital*, 302 F.Supp. 482, 485 (S.D.Iowa 1969); *M.F. Kemper Const. Co. v. City of Los Angeles*, 37 Cal.2d 696, 235 P.2d 7, 10 (1951); *Boise Junior College District v. Mattefs Const. Co.*, 92 Idaho 757, 450 P.2d 604, 605 (1969); *State v. State Const. Co.*, 203 Or. 414, 280 P.2d 370, 380 (1955); *Puget Sound Painters, Inc. v. State*, 45 Wash.2d 819, 278 P.2d 302, 304 (1954). *See generally* 10 E. McQuillin, *The Law of Municipal Corporations* § 29.67, at 383 (3d ed. 1981); Annot., 2 A.L.R.4th 991 (1980).

■ Here, the most appropriate subject of inquiry is whether requiring AIC to perform according to the terms of its mistaken bid would be unconscionable, for if so, then the mistake necessarily would be material.[6] In a letter dated April 18, 1984 the agency stated that AIC's mistake was not material, and by implication, that requiring performance would not be unconscionable. Thus, it concluded that AIC would not have been

1982). Once the interpretation of a regulation is clear, the application of the law to the particular factual circumstances of a given case is a matter committed to the agency's sound discretion. *Id.; Bowers Office Products*, 621 P.2d at 13.

6. Several courts have used the concept of unconscionability to cover elements of materiality as well. *See State v. Union Constr. Co.*, 9 Utah 2d 107, 339 P.2d 421 (1959) (court, without referring to materiality, states that mistake must be such that bidder would suffer substantial detriment by forfeiture); *Donaldson v. Abraham*, 68 Wash. 208, 122 P. 1003 (1912). Because of our determination on the subject of unconscionability, we need not discuss the rest of the factors which must be present in order to withdraw a mistaken bid.

permitted to withdraw its bid and recover its bond.[7]

The agency's letter relies on the fact that the difference between the mobilization bid price in words and figures was less than two and one-half percent of AIC's total bid for the project and that AIC would likely not be able to control its costs within such a small margin. In other words, the agency determined that even an $81,000 variation was not material in view of the large size of the project. The letter also relies on the fact that AIC's total bid was only slightly lower than the next bid.

■ This holding is in concert with decisions from other jurisdictions. Generally, in those cases which have found that a unilateral mistake will lead to an unconscionable result, the bid error has been considerably larger than two and one-half percent of the total bid.[8] The size of the bid error is not necessarily the determining fact of unconscionability. The Restatement (Second) of Contracts also contemplates that an erring bidder, in order to establish facts necessary for unconscionability, must prove that he would lose a substantial amount of money.[9] Further, the fact that the mistaken bid is not greatly disproportionate to other bids is relevant to the unconscionability question.[10]

■ All of these factors indicate that the agency was correct in making its determination. The mistake made was a small one compared to the size of the project and within the expectable variation of the contractor's costs. The mistake would not

---

7. The letter stated in relevant part:

 3. The difference between the mobilization bid price in words and figures was $81,000, less than 2½% of AIC's total amount bid for the project. Although this amount will be deductible from AIC's potential margin for profit, it does not have the potential to be financially disastrous for AIC or to impinge on the ability of AIC to complete the project as a whole. Further it is unlikely that AIC could control its costs on the project to within a margin of plus or minus 2½%.

 4. The State's experience shows that bids for mobilization characteristically vary widely between bidding contractors on specific projects. The fact that AIC's bid was significantly lower than that of other bidders could not in itself be considered material, especially since the resultant total amount bid was only slightly lower than the next low bid.

8. See, e.g., Peerless Casualty Co. v. Housing Auth. of Hazelhurst, 228 F.2d 376 (5th Cir.1955) (Applying Georgia law) (7.3%); Dick Corp. v. Associate Electric Co-op, Inc., 475 F.Supp. 15 (W.D. Mo.1979) (6.8% bid error—$1,000,000); State ex rel. Arkansas Hwy Comm'n v. Ottinger, 232 Ark. 35, 334 S.W.2d 694 (1960) (22%); Boise Junior College Dist. v. Mattefs Constr. Co., 92 Idaho 757, 450 P.2d 604 (1969) (14%); Wil-Fred's, Inc. v. Metropolitan Sanitary Dist., 57 Ill.App.3d 16, 14 Ill.Dec. 667, 372 N.E.2d 946 (1978) (17%); People ex rel. Dept. of Public Works & Bldgs v. South East Nat. Bank, 131 Ill.App.2d 238, 266 N.E.2d 778 (Ill.App.1971) (10%); Santucci Constr. Co. v. County of Cook, 21 Ill.App.3d 527, 315 N.E.2d 565, 569 (1974) (Mistake of over 40%); Baltimore County v. John K. Ruff, Inc., 281 Md. 62, 375 A.2d 237 (1977) (7.6%); City of Baltimore v. DeLuca-Davis Constr. Co., 210 Md. 518, 124 A.2d 557 (1956) (33%); Union & People's National Bank v. Anderson-Campbell Co., 256 Mich. 674, 240 N.W. 19 (1931) (6.2%); Mississippi State Bldg. Comm'n v. Becknell Constr., Inc., 329 So.2d 57 (Miss.1976) (4.7%); School District of Scottsbluff v. Olson Constr. Co., 153 Neb. 451, 45 N.W.2d 164 (1950) (13.3%); Kenneth Curran, Inc. v. State, 106 N.H. 558, 215 A.2d 702 (N.H. 1965) (97.8%); Cataldo Constr. Co. v. County of Essex, 110 N.J.Super. 414, 265 A.2d 842 (N.J. Sup.1970) (41%); Conduit & Foundation Corp. v. Atlantic City, 2 N.J.Super. 433, 64 A.2d 382 (1949) (35%); State Highway Comm'n v. State Constr. Co., 203 Or. 414, 280 P.2d 370 (1955) (20%); Rushlight Automatic Sprinkler Co. v. Portland, 189 Or. 194, 219 P.2d 732 (1950) (23%); Jordan v. Beaumont, 337 S.W.2d 115 (Tex.Civ.App.1960) (16%); Puget Sound Painters, Inc. v. State, 45 Wash.2d 819, 278 P.2d 302, 302–03 (1954) (probably 100% error); Town of La Conner v. American Constr. Co., 21 Wash.App. 336, 585 P.2d 162. (Wash.App.1978) (37%). But see City of Devil's Lake v. St. Paul Fire & Marine Ins. Co., 497 F.Supp. 595 (D.N.D.1980) (4½%—but bidder would lose substantial amount of money); Smith & Lowe Constr. Co. v. Herrera, 79 N.M. 239, 442 P.2d 197 (N.M.1968) (3½% error).

9. Compare Illustration 1 with Illustration 2 of Restatement (Second) of Contracts § 153 (1981).

10. Cf. Kenneth E. Curran, Inc. v. State, 106 N.H. 558, 215 A.2d 702, 704 (1965); Rushlight Automatic Sprinkler Co. v. Portland, 189 Or. 194, 219 P.2d 732, 753 (1950); State Highway Comm'n v. State Constr. Co., 203 Or. 414, 280 P.2d 370, 381 (1955); Boise Junior College District v. Mattefs Constr. Co., 92 Idaho 757, 450 P.2d 604, 608 (1969).

cause the bidder to lose money. The mistaken bid differs only slightly from one that was not mistaken. In view of these facts we conclude that there was a reasonable basis for the agency's determination that it would not have been unconscionable to force AIC to perform.[11]

## IV. DID THE AGENCY ABUSE ITS DISCRETION BY APPLYING ITS REGULATION FAVORING WORDS OVER NUMERALS?

Earth Movers argues that this court's decision in *Chris Berg*, as well as decisions from other jurisdictions, establish that the agency abused its discretion by following its regulation favoring words over numerals when AIC's intended bid as to the mobilization item was apparent from the bid documents. We assume for purposes of this discussion that Earth Movers is correct in its assertion that AIC's intent could be determined without resort to extrinsic evidence.[12]

This court held in *Chris Berg* that the State Department of Transportation abused its discretion by not interpreting a bid according to the bid's obvious intent discoverable from the face of the bid. Earth Movers essentially argues that AIC's bid should have also been interpreted by its intent. We conclude that this argument should be rejected.

■ First, *Chris Berg* involved a situation where the agency treated the bidder's mistake in conflict with its statutory objective under AS 35.15.050 of awarding contracts to the "lowest responsible bidder." *Chris Berg*, 680 P.2d at 94. In the present case, the agency has exercised its discretion in a manner which furthers that objective. Assuming that enforcement would not be unconscionable, public policy favors holding a contractor to its bid, even if that bid is apparently mistaken.

■ Second, the agency in the present case, unlike the situation in *Chris Berg*, acted pursuant to a well-defined policy. This court noted in *Bowers Office Products*, 621 P.2d at 13, that "public policy requires carefully drawn public competitive bidding standards and strict compliance with those standards."

Third, the court based its holding in *Chris Berg* on its finding that the agency could not reject a bid as nonresponsive because it contained a minor technical defect or irregularity. Although the mistake in AIC's bid is more substantial, the agency determined that it was not of a nature requiring rejection of the bid.

Earth Movers cites several Federal Comptroller General opinions.[13] The most

---

**11.** Earth Movers also argues that AIC's mistake was an "irregularity" that made its bid "indefinite or ambiguous to its meaning" which under Standard Specification § 102–1.07(2) requires rejection of the bid. This argument is without merit because the agency's application of the previous section 102–1.06, which gives preference to written figures over numeric figures, removed any ambiguity and left as the only question whether AIC's mistake would force an unconscionable result.

**12.** The other bids for mobilization ranged from slightly over $200,000.00 to almost $450,000.00. The agency's own engineer's estimate for this item was $300,000.00. On the other hand, by way of illustrating the often uncertain nature of determining intent solely from a document: (1) AIC was performing or about to perform another contract in the Nome area and might be expected to have lower mobilization costs than other contractors; (2) the difference between AIC's mistaken bid and its intended bid was less than the difference between its intended bid and that of any other bidder; and (3) in allocating shared mobilization costs between two contracts good reasons might exist for dividing costs unequally.

**13.** Earth Movers relies on AS 35.15.050 to invoke the Comptroller General Decisions. This statute provides in part:

> The department shall make the award in compliance with applicable federal law and the regulations promulgated under it, with this title, and in compliance with AS 37.05, and the rules and regulations promulgated under it, where they are not in conflict with this title and federal law.

However, as indicated *infra*, federal decisions do not hold that an agency policy favoring written out figures may not be followed, assuming the mistake is not material.

Further, AS 35.15.050 does not mandate that federal bidding procedures be followed exactly. In this regard, it should be noted that, unlike

supportive language for Earth Movers is found in B–158962, 45 Comp.Gen. 682 (1966). That case also involved a bidding provision stating that prices written in words shall govern in the event of variations between words and numerals. The case states:

> It would be patently absurd and inconsistent with the bid itself to view the matter as in the nature of a bid ambiguity. We believe that the invitation provision quoted above has reference to ambiguities in bids and provides a means whereby they must be resolved. But we do not believe that the provision should be construed so as to preclude the correction of apparent clerical errors. It is not necessary to go beyond the bid itself to ascertain the intended bid of Draw; that is, the written words were patently in error and the written figures constituted the bid intended.... To hold otherwise would be grossly arbitrary and wholly inconsistent with the bid itself.

*Id.* at 684–85. However, the mistake in the above case involved a 1,000 fold variance between the bid price in words as compared to numbers, which would have changed the bid from $45,000.00 to $45,000,000.00. Clearly such an error was substantial. Unconscionability was not a factor since the mistake overstated the bid rather than understating it and would have taken the bidder out of the running for the contract. The federal rule as expressed in 1B J. McBride and T. Touhey, *Government Contracts* § 12.40[2], at 12–69 (1983), is that a contracting officer cannot change the bidder's price in the total column when an obvious error in computation is present, even though the invitation expressly permits him to do so, *if such change would be substantial*. Since the agency in the present case ruled that the error was not so substantial as to justify rescission, its decision seems consistent with this expression of the federal rule.

Earth Movers also alleges that under federal law a mistaken bid cannot be corrected when the correction would displace an otherwise low bidder and the existence of the mistake and the bid actually intended are not clearly ascertainable from the bid documents themselves. It contends that the agency's application of its rules to AIC's bid amounted to a correction of the bid to a lower amount.[14] However, DOT/PF did not correct a mistake in order to make the bid consistent with the intent of the bidder. Rather, it applied its words over numerals clause to arrive at the total figure for AIC's bid.

Earth Movers cites a Maryland State Board of Contract Appeals case, *In the Matter of Appeal of Richard Klein, Inc.*, MSBCA 1116 (Feb. 23, 1983), in which the Board rejected application of a words over numerals clause. The Board stated as follows:

> However, while G.P.–3.01 [words over numerals] properly may be utilized to resolve certain discrepancies in bids, it cannot be applied with blinders. When G.P.–3.01 produces an inequitable result and the bidder alleges error, the *procurement officer cannot ignore the mistake and enforce an unconscionable result.* He must permit the bidder to correct or withdraw if warranted....

(Emphasis added). Again, this case simply restates the issue discussed above: wheth-

---

federal procedures, it is the state agency's stated policy not to inquire from the bidder what the bidder's actual intent was.

**14.** Earth Movers cites Comptroller General Decisions Nos. B–208114, B–208880, 30 CCF ¶ 70,-478 (Oct. 20, 1982), which state:

> Correction of an alleged bid mistake was properly denied because the correction would have resulted in displacement of the low bidder and the intended bid was not ascertainable from the bid itself. In cases of bid corrections which would displace the low bidder,

GAO is concerned with the degree to which the asserted correct bid is the only reasonable interpretation, ascertainable from the bid itself, of the claimed mistake. The contestor claimed that his unit price on one item was correct and that his extended total price was incorrectly higher than he intended. However, his total price was in line with both the other bids and the government's estimate. The government reasonably concluded that his total price was correct and that he had simply misplaced a decimal point in his unit price.

er the agency abused its discretion in deciding that AIC's mistake was not material and in deciding that requiring performance would not be unconscionable.

■ Earth Movers also argues that the Standard Specification 102–1.06 [15] applies only to unit prices and that AIC's mistake related not to a unit price, but a lump sum price. The State responds by contending (1) that the last sentence of the specification is not limited to unit prices, (2) that in any case the term unit price as used in the specifications includes lump sum prices, and (3) that the State has uniformly so construed the specifications. We conclude that both readings of the specification are reasonably possible and that appropriate deference to the agency requires that its interpretation be given effect. In *Rose v. CFEC*, 647 P.2d 154, 161 (Alaska 1982), we stated:

> [W]here an agency interprets its own regulation, as in the present case, a deferential standard of review properly recognizes that the agency is best able to discern its intent in promulgating the regulation at issue. K. Davis, Administrative Law Treatise § 7.22, at 105.08 (2d ed. 1979).

For the reasons stated, the judgment of the superior court has been reversed.

COMPTON, Justice, with whom BURKE, Justice, joins, dissenting.

I dissent for the following reasons. First, I believe an "abuse of discretion" standard of review is inapplicable to this case. The proper standard is "substitution of judgment." Second, even if "abuse of discretion" is applicable, I believe the agency abused its discretion.

## I. SUBSTITUTION OF JUDGMENT

*Kelly v. Zamarello*, 486 P.2d 906 (Alaska 1971), describes two different standards of review applicable for administrative decisions. One involves "complex subject matter or fundamental policy formulations." The court held that this type of decision should be subjected to a "reasonable basis" standard of review, i.e., deference should be given to the administrative interpretation, since the "particularized experience and knowledge" of the agency's administrative personnel "would be of material assistance to the court." *Id.* at 916, 917.

The other standard applied by the court concerns "statutory interpretation or other analysis of legal relationships about which courts have specialized knowledge and experience." *Id.* at 916. In these cases, the court indicated it would be appropriate for courts to substitute their judgment for that of an agency.

The *Kelly* court determined that the reasonable basis test was appropriate in that case, which involved a question of bid responsiveness, because a fundamental policy question was at issue: "A decision rejecting a bid for nonresponsiveness has application beyond the instant case, going to the integrity of the entire bidding process." *Id.* at 917.

Cases appropriate for the "substitution of judgment" standard of review were highlighted in *Mukluk Freight Lines v. Nabors Alaska Drilling*, 516 P.2d 408 (Alaska 1973). The court relied on Professor Davis for its comment that "the comparative qualification of court and agency to decide the particular issue" was the most important factor for whether a court should substitute its judgment for that of an agency's. *Id.* at 412, *quoting* 4 K. Davis, Administrative Law Treatise § 30.14 at 269 (1958). The court quoted Davis saying, "Courts are the experts in such areas as constitutional law, common law, ethics, overall philosophy of law and government,

---

**15.** Standard Specification 102–1.06 provides in relevant part:

> The bidder shall specify a unit price in words and figures, for each pay item for which a quantity is given and shall also show the products of the respective unit prices and quantities written in figures in the column provided for that purpose and the total amount of the proposal obtained by adding the amounts of the several items. All the words and figures shall be in ink or typed. In case of a descrepancy [sic] between the prices written in words and those written in figures, the prices written in words shall govern.

judgemade law developed through statutory interpretation, most analysis of legislative history, and problems transcending the agency's field [of specialization.]" *Id.* Accordingly, the court held in favor of substituting its judgment for that of the agency's, on the basis that the issues before the court had "little to do with the Commission's expertise or particularized knowledge ... [but] concern constitutional and statutory interpretations requiring the special competency of the courts." *Id.*

In a number of bidding cases, the court has disapproved a "substitution of judgment" standard. *Chris Berg, Inc. v. State Department of Transportation and Public Facilities*, 680 P.2d 93 (Alaska 1984); *State Department of Administration v. Bowers Office Products*, 621 P.2d 11 (Alaska 1980).

Despite the bidding cases in which this court has found the reasonable basis standard of review to be appropriate, all cited being *responsiveness* cases,[1] it has never carried this view as far as is being suggested in the case at bar, i.e., that *all* cases dealing with an agency's acceptance of bids be subjected only to an abuse of discretion standard of review. The *Bowers* court distinguished that case from one where the central issue might be statutory interpretation or the legal relationship between the parties, *Bowers*, 621 P.2d at 13 n. 4, indicating that a court may properly substitute its judgment for that of an agency in other agency determinations. Significantly, the central issue here is the legal relationship between the parties. Whether principles of equitable remedies will relieve an errant bidder of any obligations is emphatically *not* an issue subject to the administrative

expertise of a contracting officer. This is precisely the type of case which Professor Davis, quoted in *Mukluk*, reserved to the courts.

In its April 18 letter to Alaska International Construction, Inc. (AIC), the agency makes two statements of particular significance. First, it says that the "State would require AIC to accept a contract at the revised total amount bid or forfeit its bid bond, regardless of whether or not a second low bidder was displaced as occurred in this particular case." Later it reiterates this by asserting that "should AIC wish to do so because it claimed a mistake, it would not be allowed to either withdraw its bid or to correct its bid to the higher price for mobilization it had written in figures." These statements are simply the agency's position, should AIC attempt to withdraw its bid or otherwise be relieved of its obligations. It is this type of determination—whether AIC could avail itself of equitable defenses to a bond forfeiture claim—in which courts have expertise, not agencies. Therefore, the agency's position should be entitled to no consideration or deference. Thus, the trial court quite properly substituted its judgment for that of the agency in this case, since the central issue concerns the legal relationship of the parties.[2]

## II. ABUSE OF DISCRETION

Even if an abuse of discretion standard of review is proper in this case, I am of the view that the agency did abuse its discretion in two respects. First, I think it patently incorrect to assert that AIC did not gain a competitive advantage by submitting a bid which received differential consideration. Second, implementation of any

---

1. Relying heavily on *Kelly*, the *Bowers* court noted that "public policy requires carefully drawn competitive bidding standards and strict compliance with those standards ... [and] ... courts should not interfere with the policy decisions which are inherent in establishing criteria to be applied in making awards." *Bowers*, 621 P.2d at 13. In the case at bar, policy decisions are *not* at issue.

2. As I understand the court's decision, whenever DOT/PF determines that a bidder may not em-

ploy equitable remedies to withdraw a bid or prevent forfeiture of a bid bond, the bidder will not be entitled to a trial *de novo* in the superior court. Rather, the contractor will be forced to defend a forfeiture proceeding, for example, by convincing the trial court that DOT/PF abused its discretion in determining that equitable remedies were unavailing. This is substantially different from proving entitlement to equitable relief.

regulation which creates an artificial bid, i.e., one which was not intended, is arbitrary and capricious, and contrary to the trend in public contract law to ascertain and act upon the actual intent of the parties.

There are few public construction contract bidder cases reported in the Alaska Reporter, and unfortunately those that are reported disclose precious little about the analytical framework within which they are decided. In my view, it is not appropriate to adopt a rule of law for this state without some analysis of the different rules applied by other courts, the development of the rule we ultimately adopt, and why it is preferable to others. Merely to state the "prevailing view" and adopt it without analysis is an insufficient answer.

A. *Displacement of Low Bidder by Contracting Officer's Correction of Discrepancy Between Words and Figures.*

I have found only one case dealing with a discrepancy between words and numbers that resulted in the displacement of the apparent low bidder on a government construction contract. *Budd Construction Co. v. City of Alexandria,* 401 So.2d 1070 (La.App.), *writ denied,* 404 So.2d 1262 (1981). The City of Alexandria, Louisiana, requested bids for replacement of a bridge. Budd was the apparent second low bidder at $98,579, while Slocum, at $97,620, was the apparent low bidder. Subsequently, the city attorney, applying the City's policy of using words rather than figures,[3] ruled that Budd was the actual low bidder because Slocum's bid contained a discrepancy between a written and a numeric unit price with the low bid relying on the price written in figures. Nevertheless, the City Council awarded the contract to Slocum on the basis that Slocum agreed to be bound by the lower figure in its bid.

Budd brought suit and prevailed at the trial court and on appeal. The appellate court ruled that the city had violated its own policy of resolving a discrepancy between words and figures, and had acted arbitrarily and abused its discretion in awarding the contract to Slocum, the higher bidder. *Id.* at 1081. In its holding, the *Budd* court left no doubt as to its view that the City's acceptance of the Slocum bid was inappropriate.

> We fail to understand how a public agency can formulate policies and procedures, which it will use in making determinations regarding the awarding of public works contracts, and then simply disregard those policies and procedures in specific instances and, yet, contend that it is not acting arbitrarily. We agree with the trial court and find that the Council acted arbitrarily. We further find that this constitutes an abuse of the Council's admittedly wide discretion in handling the award of public works contracts.

*Id.* at 1080.

Despite the similarity between *Budd* and this case, there are some notable factual differences. In *Budd,* for example, enforcement of the provision interpreting words over figures displaced the bidder responsible for the discrepancy rather than the one innocent by submitting a bid without a mistake. Consequently, the *Budd* court did not render a benefit to the party responsible for the error, as would occur in this case if the *Budd* rule were to apply. Additionally, in this case, the trial court found the bid intended by AIC to be obvious on the face of the bid,[4] and enforcement of the provision requiring use of words over figures to be contrary to the clear intent of the bidder; in contrast, the trial court in *Budd* was not able to ascertain the true intent of the bidder.

---

**3.** City Resolution No. 1379–1989, establishing policies and procedures for city purchasing, states, "In case of a conflict between the written unit price and the unit price in figures, the written unit price shall govern." *Id.* at 1079.

**4.** *See* Findings of Fact III.

It is also worth noting that the *Budd* court cited no cases supporting its proposition that the city council had acted arbitrarily and abused its discretion, but rather relied solely on the city's resolution, and the court's own logic and formulation of policy. Moreover, implementation of the "words over figures" policy in the case at bar, where it benefits the party responsible for the discrepancy, may further, rather than prevent, a competitive advantage, the main policy concern of the *Budd* court.

### B. *Displacement of Apparent Low Bidder by Contracting Officer's Correction of Arithmetic or Clerical Errors.*

In *Armstrong & Armstrong v. United States*, 514 F.2d 402 (9th Cir.1975), Armstrong & Armstrong, the apparent low bidder on a government construction contract, was displaced by a contracting officer's correction of an arithmetical error in the bid of the next lowest bidder, Bovee & Crail. In that case, the sum of the separate units did not equal the sum that was bid. Plaintiff argued that there was no way to determine, from the face of the bid, whether the total bid was correct and one or more of the unit prices was in error, or if the unit prices were correct and the total was arrived at through arithmetical error. Assuming the unit prices were correct, the contracting officer reduced the second low bidder's bid by $5,340.00 though the bidder itself did not allege error and the contracting officer failed to verify the bidder's intent, as was required by federal regulation.

In a short opinion, the Ninth Circuit Court of Appeals affirmed the district court's holding in favor of Armstrong & Armstrong. According to the Ninth Circuit,

> the government acted arbitrarily, and in violation of its own regulations, by adjusting the total bid of another bidder, Bovee & Crail, in order to reconcile that total with the correct sum of the 82 item bids that comprised the overall bid.

*Id.* at 403; *accord McCarty Corp. v. United States*, 499 F.2d 633, 204 Ct.Cl. 768 (1974).

In addition to relying on a violation of regulations, the court in *Armstrong* also found that the bidder could have argued the error was in a component item, maintain the higher bid, and thus gain a competitive advantage by having an opportunity to second guess their bid. The court discussed this problem as follows:

> The government could not know from the face of the bid whether the error lay in one of the component items or in the summation. Bovee & Crail stated that the error was in the addition. Correction of the total made Bovee & Crail the low bidder. If, however, it had appeared that Bovee & Crail was already the low bidder, Bovee & Crail could have informed the government that the error was not in the addition but in one of the component items, and thus maintain the higher bid. *This opportunity to second guess one's bid after the bids have been opened subverts the competitive bidding process, and creates the potential for abuse that federal procurement regulations are designed to prevent.* (emphasis added)

*Armstrong*, 514 F.2d at 403.

In this context, it is important to note that while Bovee & Crail's intended bid was not obvious from the face of the document, AIC's intended bid was clear, and the correction made by the contracting officer was contrary to that intent.

One other legal point of interest noted by the *Armstrong* court was that the federal government had breached an implied contract "obligating the government to consider the bid fairly and honestly." *Id.; see also McCarty Corp.*, 499 F.2d at 638. The court commented that this implied contract was created by the invitation to bid and the subsequent submission of a bid. Though this jurisdiction has not previously found similar implied contracts or covenants between bidders and the public entities they deal with, this legal concept should be applied in this jurisdiction; doing so would provide additional support for relief from a

contracting officer's correction of a bid contrary to the obvious intent of the bid.[5]

In another federal case, Lametti & Sons was displaced as the apparent low bidder on a sewer construction project when the City of Davenport corrected an arithmetical error in the second low bid which was made by Johnson. *Lametti & Sons v. City of Davenport*, 432 F.Supp. 713 (S.D.Iowa 1975). The written unit price and the numerical unit price for an item in the second low bidder's bid were the same, but the corresponding extended price for that item was inconsistent. The City recalculated the extended price on the basis of the stated unit price, and subsequently reduced the total amount bid by Johnson below the Lametti bid. Applying Iowa law, the district court denied Lametti's motions for preliminary injunction and summary judgment and granted the City's motion for summary judgment. *Id.* at 716–17. The court held,

> [A]bsent fraud or collusion, correction of a 'patent mistake' in bidding is not actionable.... To have a meaningful and uniform comparison of bids, it was necessary for the city [to] recompute clearly erroneous arithmetic. The city did not alter a unit price, nor has plaintiff alleged fraud or collusion. It only made an arithmetic change to conform

the extended price to the stated unit price.

*Id.* at 716.

In the course of its analysis, the court added that the city did not act "arbitrarily or capriciously," did not apply a double standard, nor did it fail honestly to consider Lametti's bid. *Id.* at 715. Furthermore, the court commented that the integrity of the bidding system is protected by allowing correction of obvious mathematical errors. *Id.*

*Lametti* is similar to the case at bar in that the apparent low bidder was displaced as a result of the contracting entity's correction of a bid error. However, in *Lametti* the court determined the error was obvious and the correction was made to implement the intent of the bidder which is precisely the opposite of what occurred in the case at bar. *See Schiavone Construction Co. v. Samowitz*, 451 F.Supp. 29 (S.D.N.Y.), *aff'd*, 578 F.2d 1370 (2d Cir.1978).

In summary, the contracting officer's actions in this case would not be allowed under federal law. However, there is support for the general rule that contracting officers can make binding corrections of bid errors. Nevertheless, none of these cases dealt with correcting a bid error contrary to the obvious intent of the bidder; therefore, this line of federal cases does not detract from, and arguably supports, Earth Movers' position.[6]

---

5. Further light is shed on the *Armstrong & Armstrong* case by the analysis of the district court. *Armstrong & Armstrong, Inc. v. United States*, 356 F.Supp. 514 (E.D.Wash.1973). Though the district court held for Armstrong & Armstrong on the grounds that the bid correction was an unreasonable abuse of administrative discretion and an action contrary to the regulations, it also noted that the bid correction was contrary to public policy. According to the court,

> The strict maintenance of the competitive bidding procedures required by law is infinitely more in the public interest than obtaining a pecuniary advantage in individual cases by permitting practices which do violence to the spirit and purpose of the law. Conditions or reservations which give a bidder a chance to second-guess his competitors after bid-opening must be regarded as fatal to the bid. [citation]

*Id.* at 520.

The essence of the court's policy concern was that the public interest in having the lowest

possible contract cannot be allowed to prevail over the integrity of the competitive bidding process. By awarding AIC the contract the state may have saved a small amount of money, but arguably, by awarding a contract that is contrary to the bidder's intended bid, the state may have undermined the public's faith in the competitive bidding system.

6. The general federal response to a discrepancy between words and figures has been described as follows: "If there is a discrepancy between the bid prices as stated in words and as stated in figures, and if the bid is low under only one version, the bid will probably be rejected as ambiguous...." P. Shnitzer, Government Contract Bidding, at 309 (2d ed. 1982). However, in addition to the rule stated above, correction of bid errors that displaces an otherwise low and acceptable bid, is usually allowed, "only where the *existence* of the *mistake* and the *bid actually intended* are ascertainable by *clear and convincing evidence* substantially in the *bid documents*

### C. *Material Variance.*

This court analyzes this case in part in the context of whether the bid error constituted a material variance. A material variance "gives the bidder a substantial advantage over other bidders, and thereby restricts or stifles competition." *King v. Alaska State Housing Authority,* 512 P.2d 887, 892 (Alaska 1973), *quoting* 10 E. McQuillin, The Law of Municipal Corporations § 29.65 at 397 (3d ed. 1966). Mistakes that allow a bidder to choose either to perform or not perform a contract have been held to provide that bidder with a competitive advantage and therefore the mistakes are material. *Bowers Office Products,* 621 P.2d at 13. Therefore, had AIC been able to withdraw its bid prior to executing the contract, or had it been able to obtain a court judgment for rescission, reformation or return of its bid bond, then AIC's mistake would be material. Moreover, if AIC had a significant basis for arguing that it should be allowed to withdraw, the ability to make that argument should in and of itself be sufficient to constitute a competitive advantage.

The cases dealing with relief from bid mistakes generally arise out of a substantially different factual pattern than exists in this case. Furthermore, the mistake cases have been decided on the basis of related but different views of the law. In the first group of cases, relief is often granted on the basis of a lack of mutual assent. The basic proposition is that where a bid contains a mistake, it fails to reflect the intentions of the bidder and hence there was never a meeting of the minds. In the second group of cases, relief from mistaken bids is allowed where the other party was aware of the mistake, the notion being that one party should not be allowed to take advantage of an error by the other party. The third group of cases indicates that in many jurisdictions relief is granted only where the other party knew of the mistake, or should have known, and several additional elements exist. Under any of the preceding theories, discussed below, AIC could have withdrawn its bid, thereby giving it a competitive advantage.

### 1. *No Meeting of the Minds.*

The leading case on the necessity of a "meeting of the minds" in the context of a public construction contract is *Moffett, Hodgkins & Clarke Co. v. Rochester,* 178 U.S. 373, 20 S.Ct. 957, 44 L.Ed. 1108 (1900). In *Moffett,* a contractor made an error in the unit price of his bid for a public construction project. As the bids were being opened, the bidder recognized his error and brought it to the attention of the city. Despite its knowledge of the mistake, the city attempted to award the contract to Moffett on the basis that the city charter prohibited bid withdrawal or cancellation prior to letting of the contract.[7] Moffett refused the unfavorable contract and the city retained Moffett's bid bond. Moffett subsequently brought an action to recover its bond.

The Supreme Court, holding for the bidder, said, "Where the minds of the parties have not met there is no contract...." *Id.* at 385, 20 S.Ct. 961, *quoting Hearne v. New England Mutual Marine Insurance Co.,* 87 U.S. (20 Wall.) 488, 490, 22 L.Ed. 395 (1874). Though a holding for Rochester would have resulted in a financial hardship for the bidder, it is clear that financial hardship was not essential to the *Moffett* holding, i.e., the holding did not relate to the degree of harm the contractor would suffer if the contract were enforced, but rather turned on the absence of a meeting of the minds and the mutual assent necessary for a contract to exist.[8]

*themselves."* Shnitzer, *supra,* at 504. (footnote omitted) (emphasis in original).

**7.** The pertinent language of the city charter was, "neither the principal nor sureties on any bid or bond shall have the right to withdraw or cancel the same until the board shall have let the contract for which such bid is made, and the same shall be duly executed." *Id.* at 386, 20 S.Ct. at 961.

**8.** Some courts have expanded the *Moffett* holding. For example in *Kemp v. United States,* 38 F.Supp. 568 (D.C.Md.1941), relief was granted to a government contract bidder who had erred,

Several state courts have also granted bidders affirmative relief for bid errors made on public contracts on the grounds that there was never a meeting of the minds. In *Rushlight Automatic Sprinkler Co. v. City of Portland,* 189 Or. 194, 219 P.2d 732 (1950), the Oregon Supreme Court decided that following the opening of bids but prior to awarding a contract, a bidder was entitled to withdraw an erroneous bid and recover its bid deposit. The court held, "[I]f the offeree knew of the mistake, and if it was basic, or if the circumstances were such that he, as a reasonable man, should have inferred that a basic mistake was made, a meeting of the minds does not occur." [9] *Id.,* 219 P.2d at 753; *accord State v. State Construction Co.,* 203 Or. 414, 280 P.2d 370 (Or.1955).

The absence of a meeting of the minds has also long been an important feature of the rationale for granting relief in the courts of the State of New York. *Balaban-Gordon Co. v. Brighton Sewer District No. 2,* 41 A.D.2d 246, 342 N.Y.S.2d 435 (1973); *E.W. Foley Contracting Corp. v. Green,* 108 Misc. 520, 177 N.Y.S. 779, 782 (1919); *W.F. Martens & Co. v. City of Syracuse,* 183 A.D. 622, 171 N.Y.S. 87, 91 (1918); *see also People v. John W. Rouse Construction Corp.,* 26 A.D.2d 405, 274 N.Y.S.2d 981 (1966); *City of New York v. Dowd Lumber Co.,* 140 A.D. 358, 125 N.Y.S. 394 (1910).

In *Balaban,* the court granted a contractor relief from an erroneous bid where there was no meeting of the minds and enforcement would have been unconscionable. *Balaban* is primarily concerned with what types of mistakes are excusable. Traditionally courts provided relief for clerical and arithmetical errors, but not for errors of judgment. *Id.,* 342 N.Y.S.2d at 439. The court granted relief even though the bidder did not make a clerical error but rather mistakenly interpreted the bid specifications, because the bidder's negligence was not "culpable," the error was "objectively discoverable," and "the effect of the mistake was verifiable." *Id.* at 440, 441. The court reasoned these characteristics are important because they provide objective proof that the "transaction is free from mischief [thereby satisfying] a fundamental purpose of the public bidding statutes." *Id.* at 440.

Arguably, knowledge of another party's unilateral mistake, or unconscionability, are in some cases also required before relief is granted in order to ensure that this same fundamental purpose is being furthered, i.e., that the transactions are "free from mischief." Certainly if a party knows of another party's error, they must also know that the transaction was not intended to deceive, or the intended deception failed; similarly, parties do not usually choose to deceive by subjecting themselves to unconscionable consequences. Moreover, unilateral errors known to the other party satisfy the court's concern that errors warranting relief be objectively determinable and

---

even though the mistake was not discovered until *after* the contract had been awarded.

> The fact that the relations between the parties had not advanced in the Moffett Company case to the stage that it had advanced in the present case, i.e., to the point where the contractor had become bound by his execution of the contract, makes no difference when we are dealing with the question of a palpable error brought to the attention of the other party to the contract.

*Id.* at 572.

Though the *Kemp* court commented that the government's theory would have led to unconscionable results, unconscionability does not appear to have been an essential element of the decision. *Id.* at 570. Rather, the *Kemp* court relied on *Moffett,* which is based on a lack of mutual assent, and the proposition that a plaintiff is entitled to relief from a unilateral mistake when the error was known to the other party. *Id.* at 572–573.

**9.** Although the decision focuses on whether the City knew or should have known an error had been made, the City's losing argument is also worth noting. The City maintained that relief could be granted an errant bidder only "where unconscionable advantage would be taken of the mistaken party, where the mistake was made without bidder's negligence, and then only when the parties can be placed in status quo, without injury to the other party." *Id.,* 219 P.2d at 742. By rejecting this formulation of the law, the court implied that unconscionability is not essential for relief to be granted when the other party was aware of the error.

discoverable. According to the court's analysis, once these conditions are met, a meeting of the minds has not occurred because the other party knew that the bid submitted was never really intended.[10]

In conclusion, there appears to be substantial precedent from other jurisdictions for affording relief to bidders on public construction contracts where the bids fail to reflect accurately the intent of the bidder. Though this jurisdiction has never decided the issue, under these cases AIC would have been entitled to relief if they had sought it. The superior court so found and concluded. This is entirely consistent with the view expressed by Chief Justice Rabinowitz in *Chris Berg*:

> If the total figure which Chris Berg had intended to bid had in fact been different from the figure its bid contained, I think the mistake would have been material, giving Chris Berg an opportunity to withdraw.

*Chris Berg*, 680 P.2d at 95. AIC's opportunity to withdraw under this theory would have given them a competitive advantage, undermining the integrity of the public bidding system.

It is foreseeable that the court's determination to apply the statute mechanically, rather than with an eye to a bidder's intent, may produce wholly undesirable results that conflict with the public interest. For example, assume a contractor submits the low bid on a project and intends the submitted total figure to be his actual bid. Assume, however, that through a typographical error some of the *words* used mistakenly state *greater* sums for particular items included in the bid, and the total then no longer reflects the low bid. Following the court's approach, the bid would have to be "corrected," with the contractor losing a job and the state losing the opportunity to have work performed at the lowest price. Everyone loses except the other contractor who gets the job at a higher price. The court makes a point of noting that AS 35.15.050 expresses a public policy that contracts be awarded to the "lowest responsible bidder." Opinion at 12, *quoting Chris Berg, Inc.*, 680 P.2d at 94. The policy is designed to ensure that the public receive the best price possible for its projects. The rigid course that the court today adopts will not always serve the public policy expressed in AS 35.15.050, as the above hypothetical demonstrates. In the case at bar, advancement of the public policy is merely a fortuitous by-product.

This hypothetical further points out why the court's attempt to distinguish *Chris Berg* (and its focus on bidder intent) is unsatisfactory. The court observes that DOT/PF in *Chris Berg* failed to honor the policy of awarding contracts to the lowest responsible bidder, while in the instant case the agency decision "further[ed] that objective." Opinion at 631. The problem with the distinction drawn lies in its implication that "the objective" is the ultimate criterion by which agency decisions in these matters are to be judged. DOT/PF and the courts, when deciding or reviewing these cases, cannot use the aim of contracting with the lowest bidder as the paramount concern *to the exclusion of other important considerations*, such as bidder intent and maintaining the integrity of the competitive bidding system. Surely DOT/PF does not have the discretion to refuse to apply the "words over numbers" policy in a case such as the hypothetical above in order to keep a low bid. And, in the long run, it little profits the state to grab for low bids at the expense of losing the respect of responsible contractors.

10. The *Balaban* reasoning was recently reflected in *Peter Kiewit Sons' Co. v. State Department of Transportation*, 30 Wash.App. 424, 635 P.2d 740 (1981), where the court said:

> The courts have come to recognize that numerous mistakes, besides simple mathematical errors, can result in the contractor submitting a bid which does not embody his intent and thereby prevent a true meeting of the minds.... *The modern trend is to accord equitable relief to mistakes which render the bid incompatible with the true intent of the bidder, and which can be clearly and convincingly demonstrated by objective proof.* (emphasis added).

*Id.* at 744.

2. *Relief for Unilateral Mistakes Known, or Those That Should Have Been Known by the Other Party.*

The basic rule, as noted in the Restatement of Contracts, Second, is,

> Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if he does not bear the risk of the mistake ... and (a) the effect of the mistake is such that enforcement of the contract would be unconscionable, *or* (b) *the other party had reason to know of the mistake* or his fault caused the mistake. (emphasis added)

Restatement (Second) of Contracts § 153 (1981). Elaborating on this rule, the authors of the Restatement said, "If the other party had reason to know of the mistake, the mistaken party can avoid the contract regardless of whether its enforcement would be unconscionable." Restatement, *supra,* § 153 comment e, at 397.

This view is generally supported in the treatises covering public contract law. For example, the remarks of one commentator are:

> If there is an honest mistake in the bid on the part of the contractor, due to clerical errors, not intended to mislead the municipality or any other bidder, and the errors were known to the municipal officers before the contract was awarded, a bidder refusing to accept the contract who is sued for the difference between the price of his bid and the sum paid by the municipality for carrying out the contract may set up the error as a defense. [footnote omitted]

E. McQuillin, The Law of Municipal Corporations, § 29.82 at 422 (3d ed. 1981).

Similarly, in comments already cited with approval by this court,[11] Professor Corbin has stated that

> [t]here is practically universal agreement that, if the material mistake of one party was caused by the other, either purposely or innocently, *or was known to him,* or was of such character and accompanied by such circumstances that he had reason to know· of it, the mistaken party has a right to rescission. (footnote omitted) (emphasis added)

3 A. Corbin, Contracts § 610 at 692 (1960). Professor Corbin has also stated that courts will not allow offerees to "snap up" and profit from offers known to be mistaken. Corbin, *supra,* at 680.[12]

Federal courts have applied these basic principles in similar situations. *Paul Hardeman, Inc. v. Arkansas Power & Light Co.,* 380 F.Supp. 298 (E.D.Ark.1974); *C.N. Monroe Manufacturing Co. v. United States,* 143 F.Supp. 449, 451 (E.D.Mich. 1956); *West v. United States,* 143 F.Supp. 167, 169 (N.D.Fla.1956); *Ruggiero v. United States,* 420 F.2d 709, 713, 190 Ct.Cl. 327 (1970); *see also Wender Presses, Inc. v. United States,* 343 F.2d 961, 962–63, 170 Ct.Cl. 483 (1965).

In the case at bar,. there is no question that the *state* knew of the mistake—their correction of the error is ample evidence. Therefore, under this theory AIC could also have withdrawn, giving it a competitive advantage. In some jurisdictions such evidence by itself would not be sufficient to permit withdrawal. These jurisdictions impose additional conditions before relief will be granted. It remains to consider these conditions and apply them to the case at hand.

---

**11.** *See Martin v. Maldonado,* 572 P.2d 763, 769 (Alaska 1977).

**12.** Corbin, *supra,* § 609, pp. 678–692, deals generally with the topic, "Unilateral Errors of Computation in Preparing Bids and Offers." Professor Corbin generally disapproved of holdings based on no meeting of the minds, but also felt courts could be too mechanistic in setting criteria for granting relief from unilateral mistakes.

Professor Corbin was of the view that courts should weigh the various factors in each case, consider material changes of position and grant relief where appropriate if convinced that a substantial mistake was made. Corbin, *supra,* at 689. *See also* Corbin, *supra,* § 599, "Mistake in the Expression of Assent", at 592 and § 107, "Mutual Assent—Meeting of the Minds" at 478.

3. *Relief for Unilateral Mistakes Known to the Other Party, Where Several Additional Conditions Are Required.*

The "prevailing view" on relief from a bid on a public contract for reason of unilateral mistake has been reported to be as follows:

A bid may be withdrawn in the case of unilateral mistake by the bidder where the mistake is known to the other party to the transaction and (1) the bid is of such consequence that enforcement would be unconscionable, (2) the mistake is material, (3) the mistake occurred despite the exercise of ordinary care by the bidder and (4) it is possible to place the other party in status quo. (footnote omitted)

10 E. McQuillin, *The Law of Municipal Corporations,* § 29.67 at 383 (3d ed. 1981).

The leading case that represents this point of view is *M.F. Kemper Construction Co. v. City of Los Angeles,* 37 Cal.2d 696, 235 P.2d 7 (1951). In *Kemper,* the California Supreme Court allowed the contractor relief from a mistaken bid where omission of a $301,769 item resulted in a bid nearly one-third less than the amount intended. The *Kemper* court said, "Relief from mistaken bids is consistently allowed where one party knows or has reason to know of the other's error *and* the requirements for rescission are fulfilled." (emphasis added) *Id.,* 235 P.2d at 10. The *Kemper* court elaborated on what constituted the requirements of rescission, saying,

Recission [sic] may be had for mistake of fact if the mistake is material to the contract and was not the result of neglect of a legal duty, if enforcement of the contract as made would be unconscionable, and if the other party can be placed in statu quo. [citations] In addition, the party seeking relief must give prompt notice of his election to rescind and must restore or offer to restore to the other party everything of value which he has received under the contract. [citations]

*Id.; accord Boise Junior College District v. Mattefs Construction Co.,* 92 Idaho 757, 450 P.2d 604, 605 (1969); *Elsinore Union Elementary School District v. Kastorff,* 54 Cal.2d 380, 6 Cal.Rptr. 1, 353 P.2d 713 (1960); *see also Smith & Lowe Construction Co. v. Herrera,* 79 N.M. 239, 442 P.2d 197 (1968); *Kenneth E. Curran, Inc. v. State,* 106 N.H. 558, 215 A.2d 702 (1965); *City of Baltimore v. DeLuca-Davis Construction Co.,* 210 Md. 518, 124 A.2d 557 (1956); *Puget Sound Painters v. State,* 45 Wash.2d 819, 278 P.2d 302 (1954).

In addition to the cases referred to above, many federal courts, applying state law, have also required satisfaction of the multiple conditions discussed above before granting relief from unilateral bid errors. Representative of this line of cases is *M.J. McGough Co. v. Jane Lamb Memorial Hospital,* 302 F.Supp. 482 (S.D.Iowa 1969), where a federal district court applied the law it thought the Iowa courts would apply. According to the *McGough* court:

By the overwhelming weight of authority a contractor may be relieved from a unilateral mistake in his bid by rescission under the proper circumstances.... The prerequisites for obtaining such relief are: (1) the mistake is of such consequence that enforcement would be unconscionable; (2) the mistake must relate to the substance of the consideration; (3) the mistake must have occurred regardless of the exercise of ordinary care; (4) it must be possible to place the other party in status quo. [citations] It is also generally required that the bidder give prompt notification of the mistake and his intention to withdraw. [citations].

*Id.* at 485.

The *McGough* court, applying this law to a situation where, due to a clerical error, the bid was 10% (nearly $200,000) below the intended amount, the hospital was notified after the bids were opened but before the contract was awarded, and the mistake did not indicate a lack of ordinary care, held the bidder entitled to rescission of the bid and liability for the bid bond. *Accord*

*City of Devils Lake v. St. Paul Fire & Marine Insurance Co.*, 497 F.Supp. 595 (D.N.D.1980); *Mount St. Mary's College v. Aetna Casualty & Surety Co.*, 233 F.Supp. 787 (D.Md.1964), *aff'd*, 344 F.2d 331 (4th Cir.1965); *compare with Glamorgan Pipe & Foundry Co. v. Washington Suburban Sanitary Commission*, 183 F.Supp. 840 (D.Md.1960) (court denied a contractor relief from an erroneous bid on the basis that because it was only 5% below the second and third bids, and only 10% below the sixth and highest bid, it was not evident that there was a palpable error and contractor failed to show that consequences of enforcement would be unconscionable).

4. *Discussion of the Additional Conditions Imposed by Some Jurisdictions for Relief from Unilateral Mistake.*

a. *Unconscionability.*

Generally, in the context of contractor bidding cases, courts have discussed unconscionability in terms of the financial hardship that would be suffered by a mistaken bidder. Some cases, however, reflect such features as overreaching, inequitable or fraudulent conduct, unjust enrichment and the unfairness of allowing a bidder to be taken advantage of. *Ruggiero*, 420 F.2d 709; *Greenwich Contracting v. Bonwit Construction Co.*, 156 Conn. 123, 239 A.2d 519 (1968); *W.F. Martens*, 171 N.Y.S. 87. Moreover, it is a matter of hornbook law that the doctrine of unconscionability recognizes both a substantive class of unconscionable actions, such as oppression or financial hardship, and a procedural class of events, such as one party knowingly taking advantage of the other party, particularly where the first party had a superior bargaining position. J. Calamari and J. Perillo, The Law of Contracts, §§ 9–37 to –40, at 316–328 (1977).

In his extensive discussion of the law of government contract bidding, Paul Shnitzer has commented that unconscionability is not really determined by price differences, but rather by whether the contracting officer had a reasonable basis for believing that the bid submitted was the one actually intended. P. Shnitzer, *supra*, at 521. This view has been echoed by Professor Corbin, who has said: " 'Reason to know' means that the mistake, though unilateral, makes enforcement unjust." 3 A. Corbin, *supra*, § 610 at 695–96.

The law relating to relief for unilateral mistakes has changed considerably over time. Relief was first granted for unilateral errors known to the other party at the time the contract was agreed upon. J. Calamari and J. Perillo, *supra* at 306. Subsequently, relief was granted in cases where the other party did not know of the error but enforcement would be unconscionable. Recently, many courts have required both conditions, i.e., knowledge by the other party and unconscionability before granting relief.

One possible and plausible explanation for the latest legal trend is judicial error. Arguably, the unconscionability requirement may have developed both to relieve bidders from unusually harsh consequences *and* to act as an indicator of when the other party should have known of the unilateral mistake. In the sense that the unconscionable nature of the bargain puts the one party on notice of the other's error it imputes knowledge, satisfying the original requirement for relief from unilateral mistake. Therefore, there is some logic to requiring *either* actual knowledge of the other party's error, *or* imputed knowledge via unconscionability. But, without explaining how they have made the logic leap, some courts have insisted that *both* conditions be met before granting relief from bids on public contracts.

There are many examples of judicial reference to the disparity between the mistaken bid and the other bids or the engineer's estimate as evidence that contract enforcement would likely result in significant hardship to the bidder and that the disparity itself should have been sufficient to put the other party on notice, i.e., should have known of a mistake. According to the *Balaban* court, for example, "The mistake in computing the bid was 'palpable,' i.e.,

known to the other party *because of the disparity in the bids* and because of the prompt actual notice to appellant once the bids were opened.... (emphasis added) *Balaban,* 342 N.Y.S.2d at 438; *Universal Transistor Products Corp. v. United States,* 214 F.Supp. 486, 488 (E.D.N.Y. 1963); *accord C.N. Monroe,* 143 F.Supp. at 451.[13]

Arguably, the very fact that the state knowingly took advantage of AIC's error contrary to AIC's obvious intent would lead some courts to consider the state's actions unconscionable. Though AIC may not have suffered financial hardship, the loss of $90,000 is significant. More importantly, the fact that AIC's error was obvious and known to the state raises the question of why unconscionability should be required for the prima facie case at all.

b. *Materiality.*

While many of the authorities discussing relief for mistakes in bids require that the mistakes be material, there are few discussions that shed light on the standard for materiality. One possible approach suggests that a mistake be found material if it "swallows up the allocation made in the bid for profit." J. Calamari & J. Perillo, *supra,* at 307–08; *Boise Junior College,* 450 P.2d at 606. Nonetheless, the analysis tends to reduce to a case by case assess-ment. *See Kastorff,* 353 P.2d at 719; *cf.* 3A A. Corbin, *supra,* § 704 at 318; 4 A. Corbin, *supra,* § 946 at 809.

In most mistake cases the size of the mistake is large enough that the issue of materiality is never raised. However, where a material term of a contract is involved, such as the price term, the size of the error may not have a significant consideration. In the case at bar, the correction made constituted only a small percentage change, but the fact that it involved a price change of $90,000 should be sufficient to deem the mistake material.

c. *Negligence.*

Though relief has occasionally been denied for unilateral bid errors on the grounds that the mistake was due solely to the bidder's negligence, most courts have held that mistakes often occur despite the exercise of ordinary care and therefore the fact that errors are made will not by themselves prevent relief. In *M.J. McGough,* the court held: "The mistake in this case was an honest error made in good faith. While a mistake in and of itself indicates some degree of lack of care or negligence, under the circumstances here there was not such a lack of care as to bar relief." *M.J. McGough,* 302 F.Supp. at 486.

A more in-depth discussion of this issue was made by the court in *State Board of*

**13.** Elsewhere it has been pointed out that the requirement of unconscionability should be applied in cases in which the second party is innocent of the first party's error. *Ex Parte Perusini Construction Co.,* 242 Ala. 632, 7 So.2d 576 (1942). The *Perusini* court explained the circumstances justifying such application as follows:

> Not only must the mistake be material to the transaction, but the person who made the mistake must show, when he applies to an equity court for a rescission of the contract, that his mistake is not due to want of care or diligence, although the conclusion warranted by the best considered authorities is that mere neglect may not be a bar to the setting aside of the contract unless it is such as amounts to the violation of a positive legal duty and such as prejudiced the other party. *What has been said applies only to cases in which one of the parties is entirely innocent of the other's mistake.* (emphasis added)

*Id.,* 7 So.2d at 578.

The *Perusini* court then went on to distinguish unilateral mistakes that are known or should have been known to the other party, from those discussed above where the one party was innocent and had no reason to know of the other party's error.

> If one of the parties, through mistake, names a consideration that is out of all proportion to the value of the subject of negotiation and the other party realizing that a mistake must have been committed, takes advantage of it and refuses to let the mistake be corrected when it is discovered, he cannot under these conditions claim an enforceable contract. Where there is a mistake that on its face is so palpable as to place a person of reasonable intelligence upon his guard, there is not a meeting of the minds of the parties, and consequently there can be no contract. *Id.*

*Control v. Clutter Construction Corp.,* 139 So.2d 153 (Fla.App.1962):

> The term 'negligence' or its equivalent, in this connection, generally means ordinary negligence, which will not necessarily bar granting equitable relief. Otherwise qualified, it generally means carelessness or lack of good faith in calculation which violates a positive duty in making up a bid so as to amount to gross negligence or wilful negligence, when it takes on a sinister meaning and will furnish cause, if established, for holding a mistake of the offending bidder to be one not remedial in equity. It is thus distinguished from a clerical or inadvertent error in handling items of a bid, either through setting them down or in transcription. (footnote omitted)

*Id.* at 156; *see also Ruggiero,* 420 F.2d at 713; *Chris Berg, Inc. v. United States,* 426 F.2d 314, 315, 192 Ct.Cl. 176 (1970).

The degree of negligence exhibited by AIC is no greater than in the overwhelming majority of cases where relief has been granted.

### D. *Reformation.*

The law of reformation has been adequately summarized by the Supreme Court of Connecticut:

> A cause of action for reformation of a contract rests on the equitable theory that the instrument sought to be reformed does not conform to the real contract agreed upon and does not express the intention of the parties and that it was executed as a result of mutual mistake, or mistake of one party *coupled with actual or constructive fraud, or inequitable conduct on the part of the other.* [citations] (emphasis added).

*Greenwich Contracting,* 239 A.2d at 521.

In *Greenwich,* the court found the conditions for reformation were not met, but in other contractor bidding cases reformation has been granted over rescission. For example, in *Dick Corp. v. Associated Electric Cooperative, Inc.,* 475 F.Supp. 15 (W.D.Mo.1979), the court granted reformation for the following reasons:

> The evidence is clear and convincing both as to the existence of the mistake and as to the bid price *actually intended.* Since the bid price, both as uncorrected and corrected, is the lowest received, it is the determination of this Court that equity will best be served by having the bid price submitted by Dick corrected from $13,600,000 to $14,600,-000, rather than by permitting the withdrawal or rescission of the award to Dick Corporation. (emphasis added)

*Id.* at 20.

In *Dick Corp.* reformation was allowed for a unilateral error because the other party knew of the error and sought to take advantage of it. Reformation on such grounds appears consistent with the view expressed by the Second Circuit of the United States Court of Appeals: "Reformation for unilateral mistake is proper only where the mistake is, or should be, known to the other party to the contract or where it is induced by that party." *Eastern Freight Ways v. United States,* 257 F.2d 703, 707 (2d Cir.1958); *see also Chris Berg,* 426 F.2d 314.

Contracts have also been reformed and payments to contractors increased where a contracting officer was aware, or should have been aware, of a bid error but awarded the contract to the erroneous bidder anyway. *Chernick v. United States,* 372 F.2d 492, 178 Ct.Cl. 498 (1967). In *Chernick* the court stated the law as follows:

> And when a bidder had made an error in its bid price and the contracting officer has reason to know of the error, but took advantage of it, and the bidder performed in accordance with the award, the price will be corrected upon presentation of evidence clearly and convincingly establishing what the price would have been but for the error. [citation].

*Id.,* 378 F.2d at 497.

In *Chernick,* the error was not discovered until after the contract had been partially performed, making rescission impossible. However, it is arguable that the same result may occur where a contractor is

coerced into performing by the threat of forfeiture of his bid bond. If this is so, AIC could have brought a claim for reformation because the state acted with full knowledge of the bidder's intent and the bidder's mistake, and sought to take advantage of the error. If AIC had performed under protest, i.e., 1) requested withdrawal, 2) had been threatened with bid bond forfeiture, and 3) had agreed to perform (giving notice of its intent to seek reformation), then there are reasonable grounds to believe this court would have affirmed reformation. *See also Bromley Contracting Co. v. United States*, 596 F.2d 448, 219 Ct.Cl. 517 (1979) (court ordered reformation of contract after establishing that contracting officer overreached the contractor, not allowing other correction or withdrawal of a bid he should have known was mistaken); *cf. Dale Ingram, Inc. v. United States*, 475 F.2d 1177, 201 Ct.Cl. 56 (1973) (reformation denied).

Though the cases are not entirely consistent, it appears that it would have been possible for AIC to have sought reformation as well as, or instead of, rescission.

### E. *Summary and Conclusion.*

The cases discussed herein demonstrate several legal propositions. First, courts in several jurisdictions have supported actions by contracting officers to correct bid errors to make the bid conform with the intent of the bidder. However, contracting officers have been found to have acted unlawfully when they corrected bid errors contrary to regulations. Most significantly, there is *no* precedent for correcting a bid error in compliance with a regulation when doing so is contrary to the obvious intent of the bidder and results in displacement of the apparent low bidder.

The cases also indicate that there is substantial precedent for granting a bidder relief from a contract when the bidder's unilateral mistake is known to the other party, or when, due to a mistake, a bid fails to reflect the true intent of the bidder.

The basic legal issues addressed by the various scholars, commentators, and courts discussed earlier have generally been addressed by this court in one form or another. For example, this court has recognized that mutual assent is a "well-known requirement of an enforceable contract," and that mutual assent is determined by objective manifestations of the intent of the parties. *Howarth v. First National Bank of Anchorage*, 596 P.2d 1164 (Alaska 1979):

> The requirement of mutual assent cannot be defeated by the unexpressed subjective intent of one of the parties; rather, it must rest on an objective manifestation of mutual intent regarding the essential terms of the contract.

*Id.*, at 1167 n. 8.

More importantly, this court has said it will enforce the intent of the parties to a contract. It has been commented that courts should, "give legal effect to the intentions of the parties where necessary to reach a fair and just result." *Glover v. Sager*, 667 P.2d 1198, 1203 n. 11 (Alaska 1983); *Stenehjem v. Kyn Jin Cho*, 631 P.2d 482, 485 (Alaska 1981). In accord, in *McKibben v. Mohawk Oil Co.*, 667 P.2d 1223, 1227 (Alaska 1983), this court remarked, "In interpreting an offer we seek to give effect to the reasonable expectations of the offeree." Similarly, in *Chris Berg*, 680 P.2d 93, this court enforced a bid for a public contract as intended where doing so would not result in the bidder having a competitive advantage. *See also Mitford v. de Lasala*, 666 P.2d 1000, 1005 (Alaska 1983); *Amfac Hotels and Resorts v. State Department of Transportation*, 659 P.2d 1189, 1194 (Alaska 1983); *Peterson v. Wirum*, 625 P.2d 866, 872 n.10 (Alaska 1981); *Wright v. Vickaryous*, 598 P.2d 490, 497 (Alaska 1979).

The *Peter Kiewit* court commented that the modern trend in cases of mistakes in bids for public contracts is to enforce the intent of bidder. In cases such as the one at bar, where the intent of the bidder was clear and obvious on the face of the bid itself, and the agency acted contrary to that intent, and to the detriment of another bidder, there appears to be a sufficient

legal foundation on which to hold the agency's actions an abuse of discretion.

I would adopt a rule that enforces the intent of the party. Correction of a bid error which results in an unintended bid should not result in an enforceable contract under traditional notions of offer and acceptance. This court has affirmatively approved this concept in the contract context. When a correction displaces an apparent low bidder—who has submitted an error free bid—the integrity of the bidding process is undermined. Furthermore, the errant bidder, having had an opportunity to review all bids, can determine after an item by item comparison whether its corrected bid will leave a sufficient margin of profit to make it worthwhile to accept, or whether to reject and take its chances in court, should the agency decide to seek bid bond forfeiture. Thus the errant bidder is given a competitive advantage by a process which now encourages bid manipulation.

I find little to recommend the "prevailing view," which appears to be the result of judicial accident rather than reason. I think the case at bar points out the absurdity of its application.

